# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00436-SCT

*JOSHUA DAVID MIXON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/15/1999 |
| TRIAL JUDGE: | HON. ROBERT H. WALKER |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | THOMAS D. BERRY, JR. |
| | PATRICIA H. WILLIS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/13/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/4/2001 |

**BEFORE McRAE, P.J., MILLS AND WALLER, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

### INTRODUCTION

¶1. After guilt and sentencing proceedings before a jury in Hancock County, Mississippi, Joshua David Mixon was convicted of capital murder and was sentenced to life imprisonment. On appeal, Mixon raises issues concerning the admissibility of his three statements given to law enforcement officers, improper limitation of cross-examination, and prosecutorial misconduct. We affirm.

### FACTS

¶2. After leaving the Fire Dog Saloon in Bay St. Louis, Hancock County, Mississippi, on June 29, 1998, Mixon struck up a conversation with a limousine driver waiting outside the Fire Dog for his passengers. The driver recalled that Mixon bragged about being a kick boxing expert. He did not, however, believe Mixon's boasting because he saw that Mixon was heavy set and did not look like he exercised on a regular basis. The driver observed Jose Lemus leave the Fire Dog and begin walking toward the Blue Parrot, another bar. Mixon joined Lemus, and the driver saw the two of them go as far as the entrance gate to the Blue Parrot.

¶3. At some point, Mixon and Lemus left together and went to a dirt road, where Mixon shot and killed Lemus. Mixon took Lemus' wallet, took all of the cash out of it, and, while running from the scene, threw the wallet away. Mixon contacted an acquaintance, arranged for a U-Haul, went to the apartment of his girlfriend, Rosemary Hiersch, and packed up the entire apartment contents. Mixon and Hiersch stayed on the road for several days and eventually ended up in Metairie, Louisiana, where they stayed at a hotel and Hiersch found a job. Acting on a tip, an officer from the Bay St. Louis Police Department followed Mixon to Metairie and arrested him there on July 9, 1998.

## ANALYSIS

### I. WHETHER THE TRIAL COURT ERRED IN ADMITTING MIXON'S THREE STATEMENTS INTO EVIDENCE.

¶4. The general rule is that for a confession to be admissible it must have been given voluntarily and not because of promises, threats or inducements. ***Dancer v. State***, 721 So. 2d 583, 587 (Miss. 1998) (citing ***Morgan v. State***, 681 So. 2d 82, 86 (Miss. 1996)). "[T]he prosecution shoulders the burden of proving beyond a reasonable doubt that the confession was voluntary." ***Morgan***, 681 So. 2d at 86 (citing ***Haymer v. State***, 613 So. 2d 837, 839 (Miss. 1993)). This "burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward." ***Morgan***, 681 So. 2d at 87. Mixon attacks the confessions on three bases: voluntariness; promises, threats or inducements; and tampering with the audiotapes of the statements.

### A. Voluntariness of Confession

¶5. Our review of whether Mixon's confessions were voluntary is limited. The circuit court sits as a fact finder when determining voluntariness of a confession, and its determination will not be reversed unless manifestly wrong. ***Blue v. State***, 674 So. 2d 1184, 1204 (Miss. 1996); ***Porter v. State***, 616 So. 2d 899, 907 (Miss. 1993). The State has the burden of proving all facts prerequisite to the admissibility of a defendant's confession beyond a reasonable doubt. ***Blue***, 674 So. 2d at 1204; ***Porter***, 616 So. 2d at 908.

¶6. Mixon gave three recorded statements to law enforcement officials. At a pretrial suppression hearing, Lieutenant Tom Burleson, a policeman with the Bay St. Louis Police Department, testified that he read Mixon his ***Miranda*** rights while Mixon was in the custody of the Jefferson Parish Sheriff's Office in Gretna, Louisiana. Mixon signed a waiver of rights form before Lt. Burleson and Detective Kevin Fayard of the Jefferson Parish Sheriff's Office. Mixon did not appear to be intoxicated; his speech was coherent; and Lt. Burleson could not smell any alcohol on him. Mixon appeared to understand his rights, never stated that he wanted the services of an attorney, and never invoked his right to remain silent. Neither Lt. Burleson nor Det. Fayard made any promises to or coerced Mixon.

¶7. On this proof, we find that the trial court did not err in concluding that the State made a prima facie case of voluntariness.

### B. Promises, Threats or Inducements

¶8. The evidence shows that Mixon's statements were given without threats, coercion, or offer of reward. Transcripts of the three audiotapes were entered into evidence. In the first statement, Mixon claimed that Wallace "Root" Hanes shot and killed Lemus, that Hanes had stolen Hiersch's gun on a previous day, and

that he could show the police where Hanes had thrown the gun into a river.

¶9. At the end of the statement, Mixon said that he had contemplated suicide because he knew that he was in a desperate situation. He stated, "But I know I am [in a desperate situation] and ah to be honest with you, I don't give a f**k if you blow my brains out right now. I don't care." Lt. Burleson responded, "That's not going to happen," and that the law enforcement officers were there to protect him. Lt. Burleson asked Mixon not to get anybody else involved in the situation because Mixon had been through the system before and Mixon should not want anyone he cared about to have to go through the same experience. Mixon then stated that if Lt. Burleson would allow him to make a telephone call, "I'll tell you the whole f*****g story word for word and you can take it to the bank and I can go show you where the gun is at." Lt. Burleson agreed to allow Mixon to make a telephone call to Hiersch if Mixon allowed Lt. Burleson to be present during the call. Mixon agreed. Lt. Burleson then told Mixon he would allow him to call Hiersch after Mixon gave another statement.[1] The following discourse then took place:

> Mixon: Will you let me talk to her before? It's not going to change the way I feel. I just want to set some ground rules for her.

> Burleson: I don't want to make any promises to you. Okay. And I don't want you to make a promise to me.

> Mixon: I will. I wouldn't make a promise to you anyway.

> Burleson: Do you understand what I am saying? I don't want to make a promise because I cannot make a promise.

> Mixon: I can make a promise to you but I'm going to get the f*****g chair because you know that I know and Mr. Fayard knows but I need you to let me talk to her just once.

> Burleson: We will let you talk to her.

> Fayard: Are you worried not being able to talk to her after making a statement? Is [that] what you are saying?

> Mixon: (Crying.) I'm just scared, man.

> Burleson: I'll let you make. I'm [going to] let you talk to her and this is on tape. Okay. This tape that you . . . have given me points [out] the impression I'm getting now [that there is] a lot of b******t on it.

> Mixon: Yeah. . . .

¶10. The second tape was begun at 12:58 a.m. on July 10 . The *Miranda* rights were once again read to Mixon, who stated that he understood his rights. Mixon agreed that this statement was the second statement he had given that night. He went to the Fire Dog to try to make "some more money" shooting pool. After shooting pool with Lemus for a while, they left the Fire Dog and began walking down a dirt road in back. Mixon confessed that he shot Lemus twice with the gun he had in his front right pocket and then took Lemus' wallet. While running away, he took the money out and threw the wallet away. He did not want to go home because Hiersch "would know that something was wrong." At the end of the statement Mixon said

that no promises or threats were made in return for the statement and that the statement was given of his own free will. The statement was concluded at 1:15 a.m.

¶11. After Mixon was returned to Bay St. Louis by Lt. Burleson, he gave a third statement at 7:02 p.m. on July 10th. The *Miranda* rights were once again read to him, and Mixon stated that he understood his rights. Mixon said that the gun was thrown into the canal in Metairie.[2] He also stated that after he and Lemus left the Fire Dog, they went to the Blue Parrot. He also confirmed that he had talked to the limousine driver. The statement was concluded at 7:09 p.m.

¶12. In contesting the admissibility of these three statements, Mixon claims that the statements given in Louisiana were involuntary due to (1) harassment and physical violence, (2) he was left alone in the room with Lt. Burleson, "who paused the tape recorder after the questioning began," and who threatened Mixon verbally and physically coerced him during the pauses, and Mixon's independent investigator found that the first tape had 17 minutes, 38 seconds of unaccounted for time and that the second tape had 3 minutes, 21 seconds of unaccounted for time; (3) threats to involve Hiersch, promises to leave her alone, and promises to allow Mixon to see her one last time before he was transported to Bay St. Louis; (4) Mixon had been up all night and had been "grilled" by Lt. Burleson for three hours prior to giving the statement; and (5) the transcripts of the statements were incorrect. Mixon finally claims that the third statement given in Bay St. Louis was "fruit" from the first two statements.

¶13. There is absolutely no evidence in the record to support Mixon's uncorroborated claim of harassment and physical violence. Time after time during the statements, Mixon stated that he was giving the statements voluntarily. In fact, during the first statement, when Mixon said that he wanted to kill himself, Lt. Burleson stated, in essence, that Mixon should not consider that course of action and that he would not be harmed in any way. Mixon saw Hiersch within hours after he gave the first two statements, and even though she testified at trial on Mixon's behalf, defense counsel never asked her if Mixon was physically injured in any way. Surely her testimony in this regard would have been strong evidence in support of his claim. Even though Mixon claimed that the audiotape was paused at different places during the interviews so that Lt. Burleson could use physical coercion against him and his expert claimed that there was unaccounted for time on the audiotapes, Mixon admits that he did not pursue this defense because if he raised such a claim, the State was prepared to counter with an expert report which stated that there were no interruptions in the audiotape. The merits of Mixon's allegations concerning audiotape tampering are discussed and found to be without merit below.

¶14. As to Mixon's claim of promises given to induce a statement, a review of the transcript of the first statement shows that Mixon first asked that Lt. Burleson do him a favor by allowing him to talk to Hiersch. He later admitted that no one had promised him anything to give his statement. Lt. Burleson twice stated that he could not make any promises to Mixon in return for Mixon's giving a statement. In the second statement, Mixon reiterated that he had not given the statement in exchange for any promises given by Lt. Burleson.

¶15. Mixon claims that he had been up all night the previous night and that Lt. Burleson "grilled" him for three hours prior to giving the statements. First, a clear reading of the transcripts does not support Mixon's claim that the statements were involuntary due to fatigue. The conversation flowed between Lt. Burleson and Mixon, and the progression of the conversations was logical and reflects normal statements and responses between the two men. At no time did Mixon complain that he was too tired to continue.

¶16. As for the claim that Lt. Burleson "grilled" Mixon for three hours prior to the first statement, Lt. Burleson testified that, while he was in Bay St. Louis, he first heard that Mixon was arrested at about 7:10 p.m. on July 9th in Metairie. He left Bay St. Louis at about 8:45 p.m., and, while he could not remember exactly when he arrived in Metairie, he thought it could have been from 10:00 to 10:30 p.m.

> [When I arrived at the Jefferson Parish Jail, an investigator advised me] that Joshua Mixon ha[d] been asking to talk to me, and that he wouldn't eat, and wanted to see if I could get him to eat. So I then went in, talked to him briefly about he had to get something in his stomach, he had been up all night. I had been up all night. And I'm not sure if he finally ate or what, but I think he told me that he would eat something. I left the room.

This interaction occurred about 10:45 p.m. The next contact Lt. Burleson had with Mixon was at 11:53 p.m., when Lt. Burleson began his interrogation.

¶17. Mixon makes much of the fact that in the first suppression hearing, Lt. Burleson testified that he arrived in Metairie at 8:45 p.m. and that he talked with Mixon until the tape recorder was turned on for the first statement. However, at trial, Lt. Burleson corrected himself and testified that he did not leave Bay St. Louis until 8:45 p.m. The only support for Mixon's claim of a three-hour "grilling" prior to giving his statement is the discrepancy between Lt. Burleson's testimony during the suppression hearing and at trial. At trial, Lt. Burleson corrected himself and gave very positive, convincing testimony about the actual time he arrived in Metairie and the limited contact he had with Mixon prior to the first statement being given. This one discrepancy is insufficient to prove Mixon's claim of a three-hour grilling.

### C. Tampering with Audiotapes of Statements

¶18. There is no evidence in the record -- other than Mixon's uncorroborated claims -- to support his allegation that the transcripts were tampered with. In fact, defense counsel had several months prior to trial (from August to November) to compare the audiotapes with the transcripts and had the benefit of an independent expert analysis of the audiotapes, although he chose not to introduce this analysis into evidence.[(3)] As stated above, a clear reading of the transcripts shows that the conversation flowed between Lt. Burleson and Mixon and the progression of the conversations was logical and reflects normal statements and responses between the two men.

¶19. Based on this evidence, we detect no manifest error in the trial court's finding that Mixon's statements were freely and voluntarily given.

### II. WHETHER THE TRIAL COURT ERRED IN RESTRICTING THE DEFENSE'S CROSS-EXAMINATION AND IMPEACHMENT OF LT. BURLESON.

¶20. The scope of cross-examination is ordinarily broad, although the trial court in its discretion has the inherent power to limit cross-examination to relevant matters. *Banks v. State*, 631 So. 2d 748, 750 (Miss. 1994); *Sayles v. State*, 552 So.2d 1383, 1387 (Miss.1989). "Also, under M.R.E. 103(a), before error can be predicated at all upon an adverse evidentiary ruling it must appear that a substantial right of the party is affected." *Banks*, 631 So. 2d at 750; *Sayles*, 552 So. 2d at 1387.

¶21. Mixon claims that the trial court thwarted his every effort to arrive at the truth through cross-examination of Lt. Burleson. The trial court made it clear during a bench conference that defense counsel would be able to impeach Lt. Burleson with prior statements. While the trial court sustained many of the

State's objections, it also overruled many of them. The trial court even limited the State during re-direct. Defense counsel included in his closing argument all of the discrepancies in Lt. Burleson's testimony.

¶22. Lt. Burleson's cross-examination was not limited as to content. Even though Mixon claims that the trial court limited counsel by forbidding him from asking about the first suppression hearing, a full reading of the trial court's statements in context clearly shows such was not the case:

> Ask him a question, and if his response differs from a prior statement, then you can bring that up.
>
> * * *
>
> You haven't asked that question independent of a prior hearing. Just ask the question and whatever his response is, if it differs from his prior statement, then we can go into it, but just ask the question.
>
> * * *
>
> No. Don't even go into the February 5th [suppression hearing]. Just ask him a question, and if it differs from any prior statement, then we will go into it.
>
> * * *
>
> [To Lt. Burleson:] Don't say what your response was. Forget about any February statement at this -- for this question. Mr. Berry [defense counsel] is just to ask a question and give a response. [To Mr. Berry:] And if it is different from a prior statement that he has given, Mr. Berry, then you can go into it. It is real simple.

¶23. Because Mixon was allowed to fully cross-examine Lt. Burleson as to content and because defense counsel was able to point out all of the discrepancies in Lt. Burleson's testimony to the jury, we find that Mixon's right to cross-examine the witness against him was not abridged in any way, even though the trial court admonished defense counsel not to refer to the suppression hearing. This claim is without merit.

### III. PROSECUTORIAL MISCONDUCT.

¶24. A trial judge possesses the authority to declare a mistrial where prosecutorial conduct substantially deflects the attention of the jury from the issues that it has been called upon to decide or appeals to bias, passion, or prejudice, and, therefore, significantly impairs a defendant's right to a fair trial. *Hickson v. State*, 472 So. 2d 379, 384 (Miss. 1985). Although it is the duty of the district attorney to prosecute a case with diligence, it is also his duty to see that the defendant as well as the State receives a fair and impartial trial. *McCaskill v. State*, 227 So. 2d 847, 852 (Miss. 1969). However, the trial judge is the person best situated to decide upon the course of conduct necessary to elicit the truth and yet safeguard the rights of the accused, and unless we can say, from the whole record, he abused his discretion, we should not reverse. *Summerville v. State*, 207 Miss. 54, 65, 41 So. 2d 377, 380 (1949).

¶25. Mixon claims that he was prejudiced by the State's last minute discovery of a third statement. The third statement added some details to the second statement, but all of these details were corroborated by other witnesses and defense counsel should have already known them. He also complains that he did not receive the State Crime Lab report until June 14, 1999. However, the trial did not begin until November 8, 1999, giving defense counsel more than enough time to examine the report and prepare for trial.

¶26. Mixon contends that the State instructed the State Crime Lab not to cooperate with the defense. However, after the trial court and the State spoke with the State Crime Lab, its personnel cooperated with the defense. Mixon does not point to one specific instance where information that he needed to present an adequate defense was withheld from him.

¶27. Finally, Mixon points to inconsistencies in and tampering with the audiotapes of his statements. A laboratory which analyzed the tapes found them to be "completely clean" and to contain "nothing suspicious, " even though Mixon complained of "unaccounted for lapses of time." Mixon contended that the laboratory was biased towards the prosecution and wished to have the tapes analyzed by his own expert. The trial court did not allow Mixon to have his requested expert, but it did allow him to send the tapes to a "cheaper" laboratory. Mixon makes much of a report that detailed "two suspicious sounds" which could have been caused by "power failure" to support his claim of tampering. But the report itself reveals that the two sounds lasted a fraction of a second each. There is absolutely no support in the record for Mixon's allegations of tampering.

¶28. We find that the prosecution did not engage in conduct which substantially deflected the attention of the jury from the issues that it was called upon to decide, appealed to bias, passion, or prejudice, or significantly impaired Mixon's right to a fair trial. Accordingly, the trial court did not abuse its discretion in denying Mixon's motion for a mistrial.

## CONCLUSION

¶29. Because the trial court was not manifestly wrong in allowing Mixon's three statements into evidence and did not abuse its discretion in limiting cross-examination of Officer Burleson, and because the prosecution did not engage in misconduct, we affirm Mixon's conviction for capital murder and sentence of life imprisonment.

¶30. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

> **PITTMAN, C.J., BANKS AND McRAE, P.JJ., SMITH, MILLS, COBB, DIAZ AND EASLEY, JJ., CONCUR.**

1. Lt. Burleson arranged for Hiersch to visit Mixon in person prior to Mixon's return to Hancock County.

2. The pistol, which belonged to Hiersch, was later retrieved from the canal. Ballistics testing confirmed that it was the gun which killed Lemus.

3. Although the trial court denied Mixon's motion for appointment of an expert of his choice, Mixon was allowed to have the audiotapes analyzed by an independent laboratory.