# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00908-COA

**MONYA DAVIS A/K/A YAYO**                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/06/2021 |
| TRIAL JUDGE: | HON. ELEANOR JOHNSON PETERSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA BUTLER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY B. FARMER |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/29/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     In the Circuit Court of the First Judicial District of Hinds County, Mississippi, Monya Davis was tried and convicted of the first-degree, deliberate design murder of Lonnie Taylor. He was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. He timely appealed his conviction and sentence.

## FACTS

¶2.     On April 29, 2018, Ashanti Jones and Taylor had gone out to dinner and a movie. After the movie, they went to their apartment to get a phone charger for Jones to take to her friend Kayla Gordon who was staying with her grandparents on Montebello Drive in Jackson.

After stopping at a convenience store, they headed to Gordon's grandparent's house but got stopped by a train, so they turned around to go a different route. Once they were on Montebello Drive, Jones testified that she was on her phone when she heard multiple gunshots and breaking glass. According to Jones, once the shots started, Taylor pushed her down under the glove compartment, the car started swerving, and they crashed into a house. Jones stayed still for a while because she was not sure if whoever was shooting at them was "going to come back to the car and make sure [they] were dead." She testified that she called Taylor's name, touched him, and then exited the car and "started running down the street banging on doors." Jones then called 911. After investigators arrived, they took pictures of her, and she went to the police station for questioning. She was not able to offer any information regarding the shooters or the vehicle they occupied. Taylor was dead at the scene.

¶3.     According to testimony from Dr. Mark LeVaughn, an expert in forensic pathology, the cause of death was a gunshot wound to the head. Dr. LeVaughn explained that the fatal, and only, wound was a "perforating wound, which meant there was an entry and an exit wound, and there was significant injury to the skull and to the brain itself." Dr. LeVaughn testified that an actual bullet was not recovered, only a few fragments too small to be submitted to the firearms laboratory. What Dr. LeVaughn observed was "very characteristic of what [is called] a high-velocity gunshot wound" such as a rifle.

¶4.     That same night, Sonata Lewis and Davis, who were dating, were "Sunday riding" on Northside Drive in Lewis' 2015 Chevrolet Malibu. According to Lewis, they eventually

parked at Lake Hico where they met with Antoine (AC) and Marshun Carr. AC and Marshun got into the car with Lewis and Davis, and the four went back to Northside Drive. Lewis testified that Davis had an assault-rifle-type gun she called a "chopper," AC had a nine millimeter pistol, and Marshun had a .380 or .38 revolver. They eventually made it to Montebello Drive where the men were complaining about the truck behind them having bright lights. Lewis claimed that the car came to a stop and Davis exited the car, followed by Marshun and AC. According to Lewis, before Davis exited the car, he said he was "about to shoot"; she assumed because he believed the truck was following them. Lewis testified that all three men started shooting at the truck, Davis first, then Marshun, and then AC. Lewis testified on cross-examination that Davis was driving at the time of the shooting because she "had been smoking and was 'intoxicated' and 'high.'" Lewis did not see anyone in the truck. After the shooting, Davis backed the car up, and they went to a place called the "bricks" where Davis, AC, and Marshun attempted to hide the guns.[1] On August 7, 2018, Davis and Lewis moved to Texas, but Lewis returned to Mississippi about a month later.

¶5.     Andrew Harris, a crime scene investigator for the Jackson Police Department, testified as to what he saw upon arrival at the scene. He testified that shots had entered the rear of the vehicle Taylor was driving. Finding that both the vehicle and Taylor had been shot, Harris began looking for shell casings. He recovered eight shell casings size "7.62 x 39" that night and four the following day, which would have come from a rifle. He also recovered a .40-caliber casing, which would have come from a handgun. According to Harris, all the shell

---

[1] It does not appear from the record that the guns used in the shooting were ever recovered.

casings were the same except the one .40-caliber. He further explained that a revolver would not eject a shell casing.

¶6.     Daryl Owens, a nineteen-year veteran of the Jackson Police Department, and who was at the time of trial assigned to the U.S. Marshals Task Force Gulf Coast Region, was also on the scene and testified at trial. Owens testified that when he arrived at the scene, the first thing he saw was the vehicle occupied by Jones and Taylor "crashed into the front of the house," and he also saw Taylor's body in the driver's seat. He spoke with Jones, but she was unable to give him a description of the suspect vehicle. According to Owens, Jones was "frantic" and "just really kind of out of her mind at that time." He took her downtown and questioned her. Owens also spoke with the owner of the home that Taylor's vehicle crashed into and was able to obtain surveillance video. Owens testified that the video showed Taylor's vehicle running into the front of the house and a female he later identified as Jones getting out of the front driver's side of the vehicle. According to Owens, Jones ran up to the house and knocked on the door, but Owens later realized Jones was knocking on the storage room door in the carport.

¶7.     Owens testified that his investigation ultimately revealed that there were four individuals in the vehicle involved in the shooting of Taylor: Davis, Lewis, AC, and Marshun. Owens testified that he was able to locate Lewis through the help of the Department of Alcohol, Tobacco, Firearms and Explosives, a federal agency. According to Owens, they approached Lewis at her place of employment, and she was questioned by police on February 27, 2019. Lewis signed a rights waiver, gave the police access to her cell phone,

and gave a statement. She also identified Davis, AC, and Marshun from photographic lineups as the shooters.

¶8.     Owens testified that Davis had also been identified as a suspect in Taylor's murder from a Crime Stopper's tip in May 2018. Davis' name kept coming up as CBH YaYo, CBH standing for Christian Brotherhood. In April 2019, after Lewis' statement, and about a year after Taylor's murder, Davis was arrested in his garage by U.S. Marshals in Texas. Owens picked up Davis in Texas and brought him back to Mississippi. Davis signed a waiver of his rights and voluntarily gave a statement to Owens and another officer, Bruce Triplett, which was videoed and downloaded to a disc.[2]

¶9.     Davis did not testify at trial, but his statement was played for the jury. When asked about the night of the murder, Davis first said he did not know anything about it. He also initially denied that he was with Lewis, Marshun, and AC that night. When asked, "[t]ell me about the night y'all shot up the car," he responded that he never shot up a car. At this point, Owens told him that AC and Marshun were also arrested. Eventually, Davis admitted that it was he, Lewis, AC, and Marshun in the car that night and that he was driving. He claimed in his statement that AC said to stop the car, "they are following us." Davis claimed that AC and Marshun got out, that Marshun shot several times, and that AC "kinda went overboard" and had a "big gun" like an AK-47. According to Davis, he put the car in reverse and left and dropped AC and Marshun at home. Davis claimed then that Lewis dropped him off, and that was the end of it. Davis contends that it was a couple of days later when he learned that

_____

[2] Owens also testified that he was able to speak with AC and Marshun, both of whom refused to give a voluntary statement.

Taylor, known as "Lil Lonnie," a person with whom he was familiar, was killed.

¶10. According to Davis' statement, he did not tell his story earlier because "Trill" had threatened him and his family. The record does not disclose Trill's real name. He testified that Trill had killed his cousin Mario for blaming AC for Taylor's death. He explained that Trill sold drugs out of a trailer on Pocahontas Street. He also testified that he had been threatened by AC, who he had alleged was the shooter of the rifle. He continued to deny that he had a gun the night of the shooting, and he denied going into the "bricks." He also denied telling his mother about the shooting, but he thought she probably knew. Davis told the investigators that he was already in the process of moving to Texas because Whataburger, his employer in Jackson, had transferred him to Texas, and that he lived there with a friend of his mother until his mother moved there also. He denied knowing what happened to the guns used in the shooting. On appeal, Davis contends that he was improperly limited by the trial judge in his cross-examination of a State's witness.

## STANDARD OF REVIEW

¶11. In *Mohamed v. State*, 323 So. 3d 532, 546 (¶39) (Miss. Ct. App. 2021), we described this Court's standard of review:

> We recognize that "[t]he right to cross-examination is secured by the confrontation clause of the Sixth Amendment to the Constitution of the United States, made enforceable against the states by the Fourteenth Amendment." *Farmer v. State*, 301 So. 3d 731, 734 [(¶12)] (Miss. Ct. App. 2020). "While defense counsel has wide latitude in cross-examination, 'the trial court in its discretion has the inherent power to limit cross-examination to relevant matters.'" *Id.* (quoting *Mixon v. State*, 794 So. 2d 1007, 1013 (¶20) (Miss. 2001)); *see also Mitchell v. State*, 792 So. 2d 192, 217 (¶97) (Miss. 2001) ("M.R.E. 611(b) allows wide-open cross-examination so long as the matter probed is relevant."). We review a circuit court's limitation of

6

cross-examination due to relevancy for an abuse of discretion. *Id.* (citing *Zoerner v. State*, 725 So. 2d 811, 813 (¶7) (Miss. 1998)).

## ANALYSIS

**Whether the trial court erred in limiting the defense's cross-examination of Detective Daryl Owens.**

¶12. Davis contends that his cross-examination of Detective Owens was unconstitutionally limited by the trial judge. During cross-examination, Davis' counsel stated: "Monya told you about this character who sold crack and provided guns to everyone at the bricks?" At that point the State objected as to relevance. A lengthy hearing was conducted outside the presence of the jury. The State advised the trial court that Owens was a part of a U.S. Marshall's Task Force and general questions into his unrelated investigations would not be relevant and could possibly compromise other investigations. The court advised defense counsel to "tailor your questions" to focus only on any investigation into threats against Davis and avoid questions into other investigations that were unrelated to this case. Defense counsel continued to argue that he should be allowed to question Owens concerning whether he "followed up" on the lead Davis gave him about Pocahontas Street and whether he confirmed that Davis told him the truth about Pocahontas Street. The trial judge continued to insist that questions concerning search warrants for unrelated criminal activity were not relevant to this case. The trial court repeatedly directed counsel to focus his questioning of Owens on the investigation of Taylor's death and threats against Davis. The trial court ruled that questions relating to any investigation into Trill or his drug deals were "not germane to our case" and that trial counsel could only question Owens about things related to the

7

investigation of Taylor's death and his investigation, if any, into threats made against Davis. The trial judge repeated this ruling multiple times.

¶13.    Davis contends on appeal that the trial court's ruling preventing trial counsel from questioning Owens "about the findings of his investigation, specifically the credibility of Davis' statement that gang members including AC and 'Trill' threatened Davis" was error that "prejudiced Davis' ability to fully present his defense theory and violated his right to confront the State's witness." The record does not support Davis' claim as to the limits imposed by the court's ruling.[3]

¶14.    During the hearing on this issue the trial judge stated, "But, now, it would be fair game to ask, 'Did you investigate any allegations that that person made about threats against Mr. Davis?'" Defense counsel responded by asking, "So I can't ask whether or not he followed up on or tried to check out any of the things Monya told him in that interview?" The trial court repeated, "only if it relates to the investigation of Lonnie Taylor's death or threats against this defendant." The trial court consistently directed counsel to limit his questions to relevant matters.

¶15.    The authorities presented by Davis on appeal support his argument concerning his right to fully cross-examine Owens but fail to address the judge's ruling on the relevance of the line of questioning. In fact, none of the cases cited by Davis discuss relevance, and he did not file a reply to the State's brief.

_____

[3] Davis argues on appeal that "he was foreclosed from arguing that he received threats." The trial court specifically instructed trial counsel that he *could* ask Owens whether he had investigated allegations regarding threats against Davis, and actually gave a him a permissible form of such a question, but trial counsel never inquired about the issue further.

¶16.    We note that irrelevant evidence is not admissible. M.R.E. 402. In *Jackson v. State*, 245 So. 3d 433, 439-40 (¶36) (Miss. 2018), the court held:

> [A] defendant in a criminal trial has a fundamental right, implicit in the Confrontation Clauses of our federal and state constitutions, to cross-examine the witnesses testifying against the defendant. U.S. Const. amends. V, VI; Miss. Const. art. 3, § 26 (1890). The right, however, is not unbounded. *Foster v. State*, 508 So. 2d 1111, 1114 (Miss. 1987), *overruled on other grounds by Powell v. State*, 806 So. 2d 1069 (Miss. 2001). "Its contours are shaped so as to accom[m]odate other legitimate interests[]; and it is always subject to the trial court's inherent power to limit cross-examination to relevant factual issues." *Id.* (citing *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed. 2d 297 (1973), and *Johnston v. State*, 376 So. 2d 1343 (Miss. 1979)); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed. 2d 674 (1986) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").

## CONCLUSION

¶17.    The trial court judge did not abuse her discretion by limiting Davis' cross-examination of Detective Owens to relevant matters.  Accordingly, this claim is without merit.

¶18.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**

9