# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01082-COA

SEDRICK BUCHANAN AND ARMAND JONES         APPELLANTS
A/K/A ARMOND JONES A/K/A A.J. JONES

v.

STATE OF MISSISSIPPI                      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2017 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS | DANIEL HINCHCLIFF |
| | KEVIN HORAN |
| | BRADLEY D. DAIGNEAULT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/03/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., CARLTON, P.J., AND C. WILSON, J.

### CARLTON, P.J., FOR THE COURT:

¶1. A shooting occurred on Highway 82 West outside of Itta Bena, Mississippi, late on a Saturday evening in August 2015. A group of men in a light-colored Tahoe pulled up next to a red Pontiac and one or more of the men began shooting as both vehicles were traveling west on Highway 82. Shortly after the shooting, Jacarius Keys, accompanied by counsel, gave a statement to the chief investigator on the case. In his statement, Keys said that he was driving the Tahoe, and he also implicated four other men, namely Armand Jones, Sedrick Buchanan, Michael Holland, and James Earl McClung Jr. In July 2016, all five men, Keys,

Jones, Buchanan, Holland, and McClung, were co-indicted for the murder of one man in the red Pontiac and for the attempted murders of the three other men in the Pontiac.

¶2. Keys was killed on December 28, 2016—a year and a half after the shooting and from when Keys gave his statement, and approximately five months after the joint indictment was returned. The remaining four co-indictees were subsequently tried together in the Leflore County Circuit Court in May 2017. Keys's videotaped statement was admitted into evidence and played at the defendants' trial.

¶3. This appeal concerns only Jones and Buchanan. After a four-day trial, the jury found Jones guilty of first-degree murder with respect to the victim who was killed, and guilty of three counts of attempted first-degree murder with respect to the other three surviving victims. Jones was sentenced to serve life in prison for his first-degree murder conviction, and three terms of thirty years for his other convictions, all to run consecutively. Buchanan was found guilty of three counts of the lesser-included offense of aggravated assault. He was sentenced to serve three consecutive terms of twenty years in the custody of the Mississippi Department of Corrections.[1] Jones and Buchanan appeal. Finding no error, we affirm Buchanan's and Jones's convictions and sentences.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

---

[1] Co-defendants McClung and Holland were also found guilty and appealed their convictions and sentences. The appeals filed by McClung, Jones, and Buchanan were initially docketed by the Mississippi Supreme Court Clerk under one docket number, 2017-KA-01053-COA. This Court subsequently entered an order keeping McClung's appeal under the original docket number and assigning a new docket number to Buchanan's and Jones's appeals. Holland's separate appeal is pending in this Court under docket number 2018-KA-00872-COA.

¶4.     The record reflects that D'Alandis Love, Perez Love, Kelsey Jennings, and Ken-Norris Stigler were traveling west on Highway 82 about 11:00 pm on August 15, 2015.[2] They were in "Munchie" Brown's red Pontiac and were going to a club in Itta Bena called the Moroccan Lounge. As they were driving, a light-colored Tahoe sped past them, spraying bullets as it went by. D'Alandis Love was killed, and Perez Love, Jennings, and Stigler were seriously injured.

¶5.     Shortly after the shooting, Keys, accompanied by his lawyer, went to the Leflore County Sheriff's office to give a statement. He was interviewed by the chief investigator on the case, Bill Staten, on September 2, 2015. When Investigator Staten learned the video equipment had failed during that interview, he re-interviewed Keys, with his lawyer present, on September 3.

¶6.     In his interview, Keys said that he was driving the Tahoe, and he also provided information that implicated Jones, Buchanan, McClung, and Holland. After Keys gave his incriminating statement to law enforcement, he went to Attorney Kevin Horan, who represented Jones at trial, and told him that he had done so. To avoid repetition, the details of Keys's statement are addressed below.

¶7.     In July 2016, the Grand Jury of Leflore County indicted Jones, Buchanan, Keys, Holland, and McClung for "acting alone or in concert with each other or others" on one count of deliberate-design murder of D'Alandis Love in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014); and three separate counts of attempted murder

---

[2] Jennings and Stigler were D'Alandis and Perez Love's cousins. For ease of reference we will sometimes collectively refer to these four men as the Loves.

of Perez Love, Jennings, and Stigler in violation of Mississippi Code Annotated section 97-1-7 (Rev. 2014) and section 97-3-19(1)(a).

¶8. On December 28, 2016, a year and a half after the shooting and when Keys gave his statement, and approximately five months after Jones, Keys, Holland, Buchanan, and McClung were indicted, Keys was killed. To avoid repetition, the details of Keys's murder will be addressed during the Court's discussion of Buchanan's and Jones's Confrontation Clause assignment of error, below.

¶9. Jones, Buchanan, McClung, and Holland were tried together before a jury in Leflore County Circuit Court in May 2017. Each were represented by their own counsel.

¶10. Pretrial the defendants moved to exclude Keys's videotaped statement. The trial court denied the defendants' motions. The trial court's ruling will be discussed below when the Court addresses Jones and Buchanan's Confrontation Clause assignment of error. After the trial court denied defendants' motions to exclude Keys's videotaped statement, each defendant moved pretrial to sever their case from the others. The trial court also denied those motions. The trial court's ruling on the severance issue will also be discussed below.

¶11. Buchanan also moved pre-trial to exclude testimony and evidence related to his post-shooting arrest that occurred in Carroll County six months after the shooting when Buchanan was out on bond. Buchanan was a passenger in the vehicle that was stopped. In the course of the arrest, the Carroll County deputies recovered a .40-caliber pistol from the console between the driver's seat and front-passenger seat of the vehicle. Buchanan argued that the gun should be excluded at trial on relevancy grounds and that such evidence was prejudicial

4

because Buchanan did not own the gun, nor was it tied to the Love shooting. The trial court ruled that Buchanan's motion was premature and that the issue should be raised at trial outside the presence of the jury if the State sought to introduce the recovered gun.

¶12. The gun was admitted into evidence at trial, and the trial court allowed limited testimony about the gun's recovery. Jones and Buchanan both assert on appeal that the trial court erred in doing so. The Court will discuss this issue in further detail below.

¶13. Trial began on May 16, 2017. The State's witness, Matthew Brown, a deputy with the Leflore County Sheriff's Office, testified that he was on regular patrol on the night of August 15, 2015, and spotted a fire in a field off of Highway 82. Deputy Brown pulled over and approached the scene. He testified that he could see that one person was already out of the vehicle, but others were still inside, with one person trying to climb out of the driver's-side window. Deputy Brown testified that there were no bystanders or other officers at the scene. Jennings was identified as the person outside the vehicle. Deputy Brown helped Perez Love get out of the car through the window and pulled two other unconscious men out of the backseat, Stigler and D'Alandis Love. D'Alandis Love was later pronounced dead at the scene. Deputy Brown testified that he radioed for medical help and the fire department. He also testified that once he realized that it was "not just a car wreck," he called in for the sheriff and the investigator.

¶14. Bill Staten, an investigator with the Leflore County Sheriff's Office, testified that he responded to the scene at approximately 12:20 a.m. He testified that after he parked his vehicle, he walked to the scene and approached a smoldering vehicle, which he identified as

5

a red Pontiac resting nose up in a deep drainage ditch. Investigator Staten testified that he looked at D'Alandis's body and observed what he believed were gunshot wounds. The other three victims had already been transported to the hospital. Investigator Staten also testified that he examined the red Pontiac and found that the rear-passenger window had been shot out and that there were bullet holes along that side of the vehicle. He took photographs and collected evidence, including a number of 7.62 mm shell casings and one .40-caliber shell casing. These items were recovered within the immediate area of where the vehicle had traveled on (and left) the highway.

¶15. When Investigator Staten was re-called as a witness later in the trial, he testified that he retrieved a pistol from the red Pontiac the next morning after they had the vehicle towed to a secure location to let it cool off. Mark Steed, an investigator with the Mississippi Bureau of Investigation (MBI) also testified for the State, explaining that he assisted with the investigation and helped collect evidence. Investigator Steed also identified the handgun at trial that Investigator Staten recovered from the red Pontiac.

¶16. Investigator Staten further testified that Jasmine Cage was at the scene and told one of the deputies that she knew the people in the car and had witnessed the shooting. One of the deputies placed Cage in a patrol car to isolate her while Investigator Staten finished processing the scene. Investigator Staten testified that he then had her transported to the Sheriff's Office so that he could take her statement.

¶17. After Investigator Staten processed the scene, he testified that he had the Loves' vehicle sent to a secure location to be processed as well. The State's witness, Amber Conn,

6

a crime scene analyst with the MBI, was accepted as an expert in crime-scene investigation. She testified that she had examined the red Pontiac, and she opined that the car was shot from the back toward the front. During her investigation of the victims' vehicle, Conn recovered another handgun. This weapon was recovered from the front passenger floorboard that was identified as a .40-caliber Smith & Wesson pistol. Conn testified that it was fully loaded (one bullet was in the chamber) and its safety was locked when she found it.

¶18. Lisa Funte, a medical examiner for the State, testified that D'Alandis Love, who had been seated in the back of the red Pontiac on the driver's side, died as a result of multiple gunshot wounds. His manner of death was homicide.

¶19. The State's witness, Starks Hathcock, was accepted as an expert in firearms and tool-marks identification. Hathcock testified that he examined both .40-caliber pistols that were recovered from the red Pontiac and compared them to the .40-caliber bullet that was recovered from Perez Love's head. He was able to confirm that this bullet was not fired by either of the two guns recovered from the red Pontiac.

¶20. Hathcock also examined the .40-caliber pistol recovered when Buchanan was stopped after his arrest in this case, when he was out on bond. Hathcock could not positively determine whether the gun fired the recovered shell casing, but the gun could not be excluded as having done so.

¶21. Hathcock also testified that the 7.62 mm shell casings that were recovered from the highway could have been fired from an AK-47 or SKS, which Hathcock explained is some sort of semiautomatic assault rifle or a weapon designed for war. As addressed in more

detail below, one of the surviving victims, Perez Love, testified that he saw Jones in the Tahoe with a "baby assault rifle." Hathcock testified, however, that he could not compare the 7.62 mm shell casings that were recovered to a specific weapon because Jones's AK-47 was never recovered. Hathcock did testify that the projectile jackets that were recovered from the red Pontiac bore similar characteristics to the bullet that was recovered from D'Alandis Love's right chest and the bullet that was recovered from his right leg.

¶22. The State called a number of lay witnesses as well. Bentravious "Munchie" Brown testified that on the night of the incident, he had loaned his red Pontiac Grand Prix to Perez Love, Stigler, Jennings, and D'Alandis Love. He testified that Perez drove the vehicle, and the group headed to a club at around 11:00 p.m. Brown testified that he did not know which club they were going to.

¶23. Jasmine Cage, who was Perez Love's girlfriend at the time of the incident, testified that on the night of the shooting, she followed Perez and the others in Brown's car to "make sure Perez was not going to the club." Cage testified that she saw the red Pontiac that Perez and the others were in on Highway 82 ahead of her; and after she saw the red Pontiac, she saw a Tahoe or Yukon that passed her on the right. Cage initially testified that she could not see who was in the Tahoe/Yukon and did not know the color of the vehicle. When the prosecutor reminded Cage about the statement she had given to Investigator Staten shortly after the incident, she then testified that she had told Investigator Staten that she thought the vehicle was gold and that she saw Jones, as well as Keys, David Reedy, and Holland in the vehicle. She testified that she thought Jones was in the front-passenger seat and Holland was

seated in the back on the passenger side. Cage also testified that when she talked to Investigator Staten after the incident, she told him that Reedy had been driving the Tahoe/Yukon and that Keys was in the backseat on the driver's side.

¶24. Cage testified that, after the Yukon passed her, she saw "sparks like fire" a far distance in front of her. Cage called Perez's friend to ask him whether gunfire looks like fire at night time, and he said that it did. Cage testified that she then drove straight to the Moroccan Lounge. She testified that when she did not see that the red Pontiac was at the club, she turned around and headed back to Greenwood. On her way back, she testified that she saw the red Pontiac on fire in the field. She stopped her car, got out, and approached the scene. She began crying because she knew Perez Love was in the vehicle.

¶25. On cross-examination, Cage confirmed that she knew Buchanan and that she did not see him in the vehicle that night.

¶26. Two of the surviving victims of the shooting, Stigler and Perez Love, testified that Jones and Holland had been the ones who fired bullets at Perez Love, D'Alandis Love, Stigler, and Jennings as they were traveling on Highway 82 in the red Pontiac. Jennings, the other surviving victim, testified that he knew that a vehicle had pulled up beside them and that someone opened fire on them in the red Pontiac, but he could not identify either the vehicle or anyone in it.

¶27. Stigler and Perez Love both testified that the shooters were traveling in a beige or gold Tahoe-type vehicle. Perez Love testified that he saw Jones in the Tahoe with a "baby assault rifle." He explained that it was sometimes called "a mini-Draco." Stigler testified that he

9

saw Holland shooting a pistol from the vehicle, and Perez Love also said that he saw Holland with a pistol through the window of the Tahoe as the Tahoe passed them. Stigler also testified that he saw Jones shoot Perez Love in the top of the head.

¶28. On cross-examination, Stigler confirmed that he did not see Buchanan in the vehicle that night.

¶29. Perez Love testified at trial that he could not positively identify anyone besides Holland and Jones in the vehicle. He admitted, however, that he had given a statement after the incident, while he was hospitalized, and identified other people in the vehicle, including Reedy and Keys.[3] Perez testified that he identified the people in the Tahoe because he saw "all of them" riding in the vehicle every day, and he thought they were in the vehicle that night. Later in his testimony Perez Love said that after he thought about it more, he realized that he never really saw anyone except Jones and Holland. On cross-examination, Perez Love also testified that he thought Reedy was in the Tahoe that night because Reedy used to own the Tahoe.

¶30. As noted above, Keys gave a videotaped statement to Investigator Staten a few weeks after the incident. He was indicted along with Jones, Buchanan, McClung, and Holland, but he was not available at trial because he had been killed months earlier.[4] Keys's videotaped

---

[3] Investigator Staten testified that he thought Perez Love had also identified Buchanan, but Investigator Staten was not sure. Defense counsel specifically questioned Perez Love about whether he had identified Buchanan, but at trial Perez Love said he never saw Buchanan and, other than Jones and Holland, he could not recall who he had previously identified.

[4] The jury was not told that Keys had been killed.

10

statement was admitted into evidence as the State's exhibit S-6 and was played for the jury. It was not transcribed.

¶31.   In his statement Keys said that, on the night of the shooting, he was driving the gold Tahoe. He said that Michael Holland and Armand Jones were on the passenger side, James McClung was in the rear seat on the driver's side, and Sedrick Buchanan was sitting in the third-row seat.[5] According to Keys, he, Holland, Jones, Buchanan, and McClung had been at Holland's house on the night of the shooting. At around 11:00 p.m., they all got in Keys's car to go to the Moroccan Lounge in Itta Bena.

¶32.   Keys said that Jones brought his AK-47 with him, which Keys described as being "short with a long magazine." Keys said he did not know that Jones had it with him when they got in his car. He said that he did not know Jones had it until "he first upped it" (meaning until Jones began shooting it later that night). Keys also said at the end of his statement that Jones had the AK-47 that night because "he always had it." At one point in his statement Keys said that he was unsure whether anyone else had a weapon. At the end of his statement, Keys said that no one had a gun except Jones.

¶33.   Keys said that there had not been any previous discussion among the group of gunning down the Loves or of retaliation against them. However, when questioned specifically about Jones, Keys said that Jones had said "days earlier" that he needed to get one of them (the Loves) because they (the Loves) "had got some of their friends."

---

[5] In comparison, Jasmine Cage and Perez identified David Reedy as the person driving the vehicle, while Keys was in the backseat. In his statement Keys said that he was driving and Reedy was not with them.

11

¶34.   Keys said that, as they drove down Highway 82 toward Itta Bena, they approached a car and Jones called out that it looked like the Loves in that car.[6]  As they passed the vehicle, according to Keys, Jones rolled down the window, leaned out the window, and opened fire with his AK-47.  Keys said that, as soon as Jones started shooting, Jones said, "Go, go, go," and Keys sped up to get away.

¶35.   As they drove away, Keys said that Holland made a call to someone to get rid of the car because of the shooting.  Keys said that there was no discussion about this until after Holland got off of the phone, and then Holland said that they needed to get rid of the car.  Keys said he drove to Moorhead, Mississippi, and a mechanic that Holland knew met them in a grey Nissan. The mechanic took Keys's Tahoe, and Keys, Jones, Buchanan, and McClung drove off in the Nissan.  Keys said that the mechanic was going to store his Tahoe at his shop. At the time of trial, the Tahoe had not been recovered.

¶36.   Keys said that after they switched cars, they went to a Best Western hotel in Greenwood.  When asked who got the room, Keys responded, "McClung."  Keys said that when they got to the hotel, Jones brought his gun in with him.  Later, Holland and Jones left together. According to Keys, Jones returned at around 3:00 or 4:00 a.m. and when he returned, he no longer had his gun.  Keys said that he, Jones, Buchanan, and McClung spent the night at the Best Western.  The next morning, Jones arranged for his own ride home, and

---

[6] Keys said that he did not recognize the car.  Perez Love, however, said in his pretrial statement that Keys was standing outside before he (Perez) and the others had left for the club. When questioned about that statement at trial, Perez Love testified that his statement was wrong.  He said that he meant to say that it was "Munchie" (Bentravius Brown), standing outside, not Keys.

Keys, Buchanan, and McClung got a ride together. Keys was dropped off first. Keys said that he stayed with his mother for several days after the shooting until he got a lawyer and turned himself in. While he was at his mother's home in Tennessee, Keys said that Jones contacted him from a phone number Keys did not recognize and told him that he was in Chicago. At the time Keys gave his statement on September 3, 2015, Keys had not spoken with anyone else who had been involved in the incident. However, as noted above, after Keys gave his statement to law enforcement, Keys approached Jones's lawyer and told the lawyer at that time that he had given an incriminating statement.

¶37.    Buchanan turned himself in on September 18, 2015, and Holland was arrested shortly after the incident. Although Reedy was a suspect who was arrested and jailed for these crimes, the Grand Jury did not indict him.[7]

¶38.    The State rested, and Jones, Buchanan, McClung, and Holland moved for directed verdicts, which the trial court denied. No defendant testified or presented any other testimony or evidence.

¶39.    After considering the evidence and the instructions that were given, the jury found each of the defendants guilty of various offenses. Relevant to this appeal, the jury found Jones guilty of first-degree murder with respect to D'Alandis Love and guilty of three counts of attempted first-degree murder with respect to Perez Love, Jennings, and Stigler. Jones was sentenced to serve life in prison for his first-degree murder conviction, and three terms of thirty years for his other convictions, all to run consecutively, and the court ordered Jones

---

[7] The record reflects that surveillance footage was recovered during the investigation that appeared to show Reedy at a Batesville gas station forty minutes prior to the incident.

to pay court costs and fees. The jury acquitted Buchanan on Count I (deliberate-design murder of D'Alandis Love) and found Buchanan guilty of aggravated assault with respect to Perez Love, Jennings, and Stigler. The trial court sentenced Buchanan to serve three consecutive terms of twenty years for each aggravated-assault conviction and ordered Buchanan to pay court costs and fees. Jones and Buchanan each filed motions for judgment notwithstanding the verdict and for a new trial, which the trial court denied. Jones and Buchanan appealed.

## DISCUSSION

I. **Admissibility of Keys's Statement Against Buchanan and Jones[8]**

A. **The Confrontation Clause and Exceptions to the Rule Against Hearsay**

¶40. Buchanan and Jones assert that the trial court erred in allowing Keys's statement into evidence against them, alleging that it violated their right to confront the witness as guaranteed by the Sixth Amendment of the United States Constitution[9] and Article 3, Section 26 of the Mississippi Constitution,[10] which both provide a defendant the right to confront a witness against him. McClung also asserted that the statement was inadmissible hearsay.[11]

---

[8] *See* Jones's Appellant's Brief (Issue 1); Buchanan's Appellant's Brief (Issue 1).

[9] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.

[10] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Miss. Const. art. 3, § 26.

[11] Hearsay, as defined in Mississippi Rule of Evidence 801, is inadmissible unless the law provides otherwise, including the exceptions in Mississippi Rule of Evidence 804. *See* M.R.E. 802.

14

In general, the standard of review "regarding admission or exclusion of evidence is abuse of discretion." *Jenkins v. State*, 102 So. 3d 1063, 1065 (¶7) (Miss. 2012). However, we review a Confrontation Clause objection de novo . *Smith v. State*, 986 So. 2d 290, 296 (¶18) (Miss. 2008). For the reasons addressed below, we find no error in the trial court allowing Keys's statement against Buchanan and Jones to be admitted at trial.

¶41. Before trial, Buchanan and Jones, as well as the other defendants, moved to exclude Keys's statement given to Investigator Staten based upon the Sixth Amendment and hearsay grounds. The State argued in response that Keys's statement was admissible against each defendant under Rule 804(b)(3) (the statement-against-interest exception) and the exception under Rule 804(b)(5) (the catch-all exception) of the Mississippi Rules of Evidence. The State also argued that Keys's statement was admissible under the forfeiture-by-wrongdoing theory as embodied in Rule 804(b)(6) and caselaw recognizing a similar exception under the Confrontation Clause.[12]

¶42. At the admissibility hearing, the defendants presented one witness, Attorney Kevin Horan, who represented Jones at trial. He testified that Keys had come to his office, told him he was out on bond, and that Keys had told him "the only reason he gave a statement was because he got a lower bond." Horan testified that at that point, he stopped Keys immediately and told him if was going to "change his story" then he needed to do it through counsel. Horan testified that Keys did not "tell me what he said or anything." According to Horan, Keys just "made some other comments and then he left." Horan did not testify

---

[12] *See Davis v. Washington*, 547 U.S. 813, 833 (2006); *Crawford v. Washington*, 541 U.S. 36, 62 (2004).

15

whether he told anyone else about Keys's visit to his office. However, the record reflects that Keys's statement was provided to all the co-defendants through discovery at the beginning of the case.

¶43. The State presented two witnesses. The first witness the State called was Sergeant Jeri Bankston, a detective with the Greenwood Police Department, who investigated the Keys shooting that occurred on December 28, 2016. She obtained the video-surveillance footage from the Chevron Station near where the shooting occurred. The video-camera footage was played at the hearing. The footage showed Keys running across the Chevron parking lot with Holland running behind him. Buchanan and other men, including Anthony Flowers, Ladarius Lemock, and Danarius Jackson, were in the parking lot at the same time. The footage also showed Holland with a gun in his hand. Sergeant Bankston testified that she developed five suspects in the Keys case: Holland, Buchanan, Lemock, Jackson, and Flowers.

¶44. On cross-examination, Sergeant Bankston testified that Jones was in jail at the time of Keys's death. Sergeant Bankston further testified that Buchanan was arrested on December 29, 2016, for Keys's shooting, and that Holland received a text message from Buchanan when Buchanan was in jail. The caller-ID showed the text message was from "A.J.," whom she believed was Armand Jones. She said that the text message read something to the effect of "Hey, this is Sed." She did not recall what was in the rest of the text message. Sergeant Bankston confirmed that Jones and Buchanan were in jail at the same time when the text message was sent from Jones's phone.

16

¶45. The State's second witness was Investigator Staten, the chief investigator in the Love

shooting case. He testified that shortly after the August 15, 2015 shooting, Keys, with his

lawyer, came to the Leflore County Sheriff's Office and said that he wanted to give a

statement. Investigator Staten was called in to take the statement. He testified that he

initially interviewed Keys, with his lawyer present, on September 2, 2015. Due to equipment

failure, however, Investigator Staten had to re-interview Keys on September 3, 2015. Keys's

lawyer was also present at that interview. The interview was videotaped, but not transcribed.

The videotaped interview was played for the trial court at the admissibility hearing.

¶46. During cross-examination, Investigator Staten acknowledged that there were

inconsistencies in Keys's statement as compared to statements given by other witnesses

regarding the people in the Tahoe and where they were sitting.

¶47. After argument of counsel, the trial court denied the defendants' motions to exclude

Keys's statement and stated that it would enter a written order stating the reasons supporting

its decision to allow the videotaped interview to be admitted into evidence at trial. In its

written order, the trial court concluded that Keys's statement was admissible under three

exceptions to the hearsay rule: Rule 804(b)(3) (statement against a person's interest); Rule

804(b)(5) (the catch-all hearsay exception); and Rule 804(b)(6) (the forfeiture-by-

wrongdoing exception).[13] We address the trial court's rulings below.

---

[13] The trial court primarily relied upon *United States v. Thompson*, 286 F.3d 950 (7th Cir. 2002), in determining that the forfeiture-by-wrongdoing exception applied. The court summarized *Thompson* as follows: "According to the Seventh Circuit, the waiver-by-misconduct of the right to confront witnesses by one conspirator, resulting from misconduct by that conspirator which causes the witness's unavailability, may be imputed to another conspirator if the misconduct was within the scope and in furtherance of the

¶48. Relevant evidence, as defined in Rule 401, is generally admissible subject to certain laws regarding exclusions and exceptions. *See* M.R.E. 402. Rules regarding hearsay address concerns with admitting evidence that, albeit relevant, is not sufficiently reliable. *See* M.R.E. 801 & advisory committee note. The Mississippi Supreme Court has recognized that "*[n]ontestimonial* hearsay is subject to evidentiary rules concerning reliability rather than being subject to scrutiny under the Confrontation Clause. However, *testimonial* hearsay must be filtered by the Confrontation Clause." *Smith*, 986 So. 2d at 296-97 (¶20) (emphasis added) (citing *Crawford*, 541 U.S. at 36, 53)). Statements given in the course of a police interrogation are *testimonial* "when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 297 (¶21) (quoting *Davis*, 547 U.S. at 822).

¶49. Under this test, we conclude that Keys's statement was testimonial in that Investigator Staten interrogated Keys to establish events concerning the shooting—events potentially relevant to future criminal prosecution.

¶50. Accordingly, even if Keys's statement meets the evidentiary reliability rules set forth in Rule 804(b)(3) or Rule 804(b)(5), these rules do not circumvent a defendant's rights under the Confrontation Clause. *Smith*, 986 So. 2d at 298 (¶26) (recognizing that "*Crawford* holds that when dealing with testimonial evidence, a finding of reliability does not create an exception to the Confrontation Clause") (citing *Crawford*, 541 U.S. at 61); *see Sanders v. State*, 228 So. 3d 888, 891-92 (¶¶12-16) (Miss. Ct. App. 2017) (finding that the circuit court

---

conspiracy, and was reasonably foreseeable to him." (Citing *Thompson*, 286 F.3d at 965).

erred when it admitted witness's testimonial statement in violation of the Confrontation Clause of the Sixth Amendment, but finding error harmless under the circumstances of that case).

¶51.    A party, however, "who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833; *see also Crawford*, 541 U.S. at 62 ("[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds . . . ."). Likewise, under Rule 804(b)(6), a party forfeits his rights to object to a prior testimonial statement on hearsay grounds if the party "wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." M.R.E. 804(b)(6) & advisory committee note.

¶52.    The trial court in this case found that Keys's statement was admissible against Buchanan and Jones under the forfeiture-by-wrongdoing doctrine as embodied in Rule 804(b)(6). Like the trial court, we find no Mississippi law interpreting Mississippi Rule 804(b)(6), and thus we electively look for guidance from federal cases analyzing the identical Rule 804(b)(6) of the Federal Rules of Evidence and related Confrontation Clause principles.[14]

¶53.    As recognized by the United States Supreme Court, federal Rule 804(b)(6) codifies the equitable doctrine of forfeiture by wrongdoing, *Davis*, 547 U.S. at 833, "which applies only when the defendant engaged or acquiesced in wrongdoing that was intended to, and did,

---

[14] "In interpreting the Mississippi Rules of Evidence, it is appropriate to look to federal law interpreting the Federal Rules of Evidence for guidance." *Portis v. State*, 245 So. 3d 457, 470 (¶31) (Miss. 2018).

procure the unavailability of the declarant as a witness." *Giles v. California*, 554 U.S. 353, 367 (2008) (internal quotation mark omitted). In order for Keys's statement to be admissible against Buchanan and Jones, the State, as the party offering the evidence, was required to prove the facts meeting these requirements as to Jones and Buchanan by a preponderance of the evidence. *United States v. Gurrola*, 898 F.3d 524, 534 (5th Cir. 2018).

### 1.     Buchanan

¶54.    With respect to Buchanan, based upon our review of the record and the applicable law, we find that the State presented sufficient evidence at the admissibility hearing to show that Buchanan engaged in or acquiesced in the wrongdoing that was intended to, and did, procure Keys's unavailability. *Giles*, 554 U.S. at 367. Hence, the trial court did not err in admitting the statement. As detailed above, the video-camera footage played at the hearing showed Keys running across the parking lot with Holland running behind him. Holland was shown on the video with a gun. Keys was shot moments later. Buchanan was there and appeared to be looking around the area of the parking lot. We find that the trial court could reasonably infer from Buchanan's location and his mannerisms that Buchanan was acting as a lookout.

¶55.    Additionally, Sergeant Bankston, the investigator on the Keys murder, testified that Flowers, who was in the group with Buchanan at the Chevron parking lot on the night Keys was shot, stated that Keys "got what he deserved because he turned State's evidence." Sergeant Bankston also testified that she developed both Holland and Buchanan, as well as Flowers and others, as suspects in Keys's murder. Finally, Sergeant Bankston testified that

20

Holland received a text message from Buchanan on Jones's cell phone after Buchanan was arrested and in jail for Keys's murder.

¶56. We find that the trial court could reasonably infer, based on the totality of these circumstances, that a preponderance of the evidence showed that Holland, with Buchanan's assistance, killed Keys to prevent him from testifying. *Gurrola*, 898 F.3d at 534 (The party seeking to have a declarant's statements admitted against another party under the forfeiture-by-wrongdoing exception must prove this exception "by a preponderance of the evidence.").

¶57. In particular, at least a preponderance of the evidence showed that Buchanan participated (or "engaged") in Keys's murder by acting as lookout on the night of Keys's murder. Regarding their intent to prevent Keys from testifying, Jones's attorney, Kevin Horan, testified at the admissibility hearing that Keys came to him and told Horan that he had given a statement, and the record reflects that Keys's statement was provided to defendants early in the case. This, coupled with Flowers's presence in the group with Buchanan at the Chevron parking lot the night of Holland's shooting, and his subsequent statement that Keys "got what he deserved because he turned State's evidence," creates at least an inference that Holland and Buchanan were motivated and intended to prevent Keys from testifying at trial. *Gurrola*, 898 F.3d at 534.

¶58. At the very least, these circumstances support the trial court's determination that Buchanan "acquiesced in" Keys's murder. *United States v. Rivera*, 412 F.3d 562 (4th Cir. 2005), supports our "acquiescence" determination. In *Rivera*, the Fourth Circuit Court of Appeals discussed the term "acquiescence," recognizing that it "consists of 'the act or

21

condition of acquiescing or giving tacit assent; agreement or consent by silence or without objection.'" *Id.* at 567 (quoting Webster's Unabridged Dictionary 18 (Random House, 2d ed. 2001)). The court further observed that "the plain language of [Rule 804(b)(6)] supports the district court's holding that a defendant need only tacitly assent to wrongdoing in order to trigger the Rule's applicability . . . the personal commission of the crime[] is not required." *Id.*

¶59. In sum, we find that the trial court did not abuse its discretion or err in finding that the State met its burden of proving, by a preponderance of the evidence, that Buchanan "engaged in" or "acquiesced in" Keys's murder for the purpose of preventing him from testifying. Accordingly, we find that the trial court did not err in allowing Keys's statement to be used against Buchanan at trial.

### 2. Jones

¶60. With respect to Jones, the State asserts that it presented sufficient evidence at the admissibility hearing to allow the trial court to infer that Holland, with Buchanan's assistance, killed Keys for the purpose of preventing him from testifying at trial and that Jones is liable for "acquiescing" in procuring Keys's unavailability under the conspiratorial responsibility theory announced in *United States v. Cherry*, 217 F.3d 811 (10th Cir. 2000). Jones, on the other hand, asserts that he was incarcerated at the time of Keys's death, and there was no evidence presented at the admissibility hearing that he had anything to do with Keys's death. He therefore asserts that the trial court impermissibly allowed Keys's statement to be used against him at trial. For the reasons set forth below, we find that

Holland and Buchanan's waiver-by-misconduct can be imputed to Jones under the *Cherry* conspiratorial responsibility theory. Accordingly, we find that the trial court did not err in allowing Keys's statement to be used against Jones at trial.

¶61. *Cherry* involved five defendants charged with involvement in a drug conspiracy. *Id.* at 813. Much of the State's evidence was from a cooperating witness named Lurks. *Id.* Prior to trial, one of the alleged drug co-conspirators, Price, murdered Lurks. *Id.* The trial court granted the other co-conspirators' motion to suppress Lurks's statement against them, finding that there was insufficient evidence as to one defendant that she "procured Lurks's absence"; and finding as to the other three defendants that there was no evidence that these defendants "had actual knowledge of, agreed to[,] or participated in [Lurks's] murder." *Id.* at 814.

¶62. In relevant part, the Tenth Circuit reversed and remanded to the district court for findings on the following issue: "[W]as . . . Price's murder of Lurks within the scope, in furtherance, and reasonably foreseeable as a necessary or natural consequence, of an ongoing drug distribution conspiracy involving the defendants?" *Id.* at 822. Elaborating on this issue, the Tenth Circuit held:

> [T]oday we hold that participation in an ongoing drug conspiracy may constitute a waiver of constitutional confrontation rights if the following additional circumstances are present: the wrongdoing leading to the unavailability of the witness was in furtherance of and within the scope of the drug conspiracy, and such wrongdoing was reasonably foreseeable as a "necessary or natural" consequence of the conspiracy.

*Id.* at 821 (emphasis omitted). In sum, under *Cherry*, "[a] defendant may be deemed to have waived his or her Confrontation Clause rights (and, a fortiori, hearsay objections) if a

23

preponderance of the evidence establishes [that] . . . the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." *Id.* at 820.

¶63. The Tenth Circuit also clarified in *Cherry* that "the scope of the conspiracy is not necessarily limited to a primary goal—such as bank robbery—but can also include secondary goals relevant to the evasion of apprehension and prosecution for that goal—such as escape, or, by analogy, obstruction of justice." *Id.* Two years later, in *Thompson*, the Seventh Circuit Court of Appeals adopted the *Cherry* conspiratorial responsibility test and likewise recognized that "acts taken to prevent apprehension . . . [including] [w]itness tampering . . . can constitute waiver-by-misconduct." *United States v. Thompson*, 286 F.3d 950, 964 (7th Cir. 2002). As noted above, no Mississippi appellate court has addressed this issue.

¶64. Based upon our de novo review of the record from the admissibility hearing and the applicable law, we find that the State presented sufficient evidence at the hearing that would allow the trial court to reasonably infer that Jones conspired with Holland, at a minimum,[15] to kill the Loves, and that Keys's murder was within the scope of that conspiracy and reasonably foreseeable to Jones. *Cherry*, 217 F.3d at 820-21.

¶65. Keys's video statement, which was played at the admissibility hearing, supports this determination. In his statement, Keys said that Jones was with Keys, Holland, McClung and Buchanan at Holland's house the night of the shooting. According to Keys, a few days

---

[15] We separately discuss Buchanan's involvement in the conspiracy to kill or harm the Loves based upon the trial record and proceedings in addressing Buchanan's sufficiency or weight-of-the-evidence assignment of error below.

earlier Jones had said that he needed to get one of the Loves because they (the Loves) had "got some of their friends." Keys said that on the night of the shooting, the group decided to go to the Moroccan Lounge in Itta Bena, and all five men got in Keys's Tahoe. Keys stated that Jones brought his "short" AK-47 with him when they left Holland's house. Keys further stated that on their way to the club, while traveling on Highway 82, Jones called out that it looked like the Loves in a car (the red Pontiac) ahead of them and that it was Jones who then opened fire on the Love vehicle as they passed it.

¶66. After the shooting, according to Keys, Holland made a call and arranged for them to swap cars. Later that evening, after they swapped cars, they went to a Best Western hotel in Greenwood and got a room. Keys said that Jones brought his gun in with him into the hotel room. Later, Holland and Jones left together. According to Keys, Jones returned about 3:00 or 4:00 a.m. When Jones returned, he no longer had his gun.

¶67. Additionally, at the admissibility hearing, Jones's lawyer testified that Keys had come to him and told him he had given a statement to law enforcement, and it was further brought out at the admissibility hearing that the defendants had received a copy of Keys's statement in discovery early in the case. Finally, Sergeant Bankston testified at the admissibility hearing that Buchanan was arrested and in jail for Keys's murder and that Buchanan was in jail with Jones. She further testified about a connection among the three men—Holland received a text message from Buchanan on Jones's cell phone after Keys's murder.

¶68. We find that under the totality of the circumstances, the trial court had sufficient evidence before it to reasonably infer a conspiracy at least between Jones and Holland to kill

25

or harm the Loves and that Keys's murder was in furtherance and within the scope of that conspiracy. *Thompson*, 286 F.3d at 964; *Cherry*, 217 F.3d at 820. We further find that evidence in the record supports the trial court's finding that Keys's murder was foreseeable to Jones, particularly in the light of the violent conduct Jones had already engaged in with respect to his actions on the night of the Love shooting. *Cf. Thompson*, 286 F.3d at 966 (finding that co-conspirator informant's murder was not reasonably foreseeable where there was no evidence that defendants, as part of their drug conspiracy, had previously engaged in murder or attempted murder). We therefore find no error in the trial court's decision to allow Keys's statement against Jones at trial.

### B. Exclusion of Keys's Statement as Self-Serving

¶69. Jones asserts that Keys's statement should also have been excluded because it was self-serving. We find no merit in this argument. In support of his argument, Jones relies on *Simmons v. State*, 805 So. 2d 452 (Miss. 2001), a case in which *the defendant* sought to introduce a videotape of himself after he murdered the victim as mitigating evidence of his remorse. *Id.* at 488 (¶¶93-94). The State did not offer the tape into evidence. *Id.* at 488 (¶94).

¶70. Under these circumstances, the Mississippi Supreme Court held that the trial court correctly disallowed the videotape, recognizing that "[o]ur caselaw states that *the defendant* is barred from introducing a statement made by the defendant immediately after the crime, if it is self-serving, *and if the State refuses to use any of it.*" *Id.* at 489 (¶95) (emphasis added). The supreme court elaborated on this principle, observing that "[a] declaration made

26

by a defendant in his own favor, *unless part of the res gestae or of a confession offered by the prosecution*, is not admissible for the defense." *Id.* (emphasis added). In this case, the State offered Keys's statement, not any defendant's statement, and thus the rule prohibiting admission of self-serving statements does not apply.

## II. Jones's Motion for Severance

¶71. Jones asserts that after the trial court erred in allowing the Keys's statement to be admitted against him, it further erred in failing to sever his trial from the other defendants because it resulted in Jones "being subjected to evidence [contained in Keys's statement] that at best might only properly be admitted against co-defendant Michael Holland." We find no merit in this assignment of error for the reasons addressed below.

¶72. Regarding severance of trials, Uniform County and Circuit Court Rule 9.03, which applied when Jones and the other co-defendants were tried in May 2017,[16] provides as follows:

> The granting or refusing of severance of defendants in cases not involving the death penalty shall be in the discretion of the trial judge. The court may, on motion of the state or defendant, grant a severance of offenses whenever:
>
> 1. If before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense . . . .

As the Rule provides, we review the trial court's refusal to grant a motion for severance for an abuse of discretion. *King v. State*, 857 So. 2d 702, 716 (¶19) (Miss. 2003).

¶73. In reviewing the denial of a motion for severance, we consider two criteria: "(1)

---

[16] The supplanting Mississippi Rules of Criminal Procedure did not become effective until July 1, 2017.

27

whether the testimony of one co-defendant tends to exculpate that defendant at the expense of the other defendant and (2) whether the balance of the evidence introduced at trial tends to go more to the guilt of one defendant rather than the other." *Hayes v. State*, 168 So. 3d 1065, 1074 (¶34) (Miss. Ct. App. 2013) (internal quotation marks omitted) (citing *Hawkins v State*, 538 So. 2d 1204, 1207 (Miss. 1989)). Because this test was first articulated in *Duckworth v. State*, 477 So. 2d 935, 937 (Miss. 1985), we will refer to these factors as the "*Duckworth* factors." Under *Duckworth*, Jones must also show that he was prejudiced by the trial court's refusal to grant his motion for severance in order for this Court to reverse and remand his case for a new trial. *Duckworth*, 477 So. 2d at 937.

¶74.　In applying this test, we also recognize that "[d]efendants jointly indicted for a felony are not entitled to separate trials as a matter of right." *Sanders v. State*, 942 So. 2d 156, 158 (¶11) (Miss. 2006). The Mississippi appellate courts, as well as the United States Supreme Court, have recognized the appropriateness and importance of joint trials, as follows: "Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability-advantages which sometimes operate to the defendant's benefit." *Cavett v. State*, 717 So. 2d 722, 727 (¶30) (Miss. 1998) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)); *Sneed v. State*, 31 So. 3d 33, 38 (¶11) (Miss. Ct. App. 2009) (same).

¶75.　Regarding the first *Duckworth* factor, Jones does not argue, nor do we find, that Keys's statement was exculpatory, and the record reflects that no defendant testified at trial in his own defense. As such, one defendant's testimony could not be used to exculpate

28

himself at the expense of the other co-defendants. The first factor, therefore, weighs in favor of a joint trial. *Sneed*, 31 So. 3d at 39 (¶14).

¶76. As to the second factor, we find that the balance of the evidence introduced at trial did not weigh far heavier in support of Holland's guilt over that of Jones, as Jones argues. Indeed, both Jones and Holland were identified at trial as shooters. Further, the defendants were charged with acting in concert with respect to the Love shooting. Keys's statement was one piece of evidence relaying the events of that evening. Thus, the second factor also weighs in favor of a joint trial.

¶77. Upon review of the record and applying controlling law, we conclude that Jones failed to show that either *Duckworth* factor was met or that he was prejudiced by the trial court's refusal to grant his motion for severance. Accordingly, we find that the trial court did not abuse its discretion in denying Jones's motion for severance.

### III. Sixth Amendment Right to a Public Trial

¶78. The record reflects that on the first day of trial, during voir dire, law enforcement officers learned of a threat to the security at trial. In particular, weapons were confiscated from two vehicles that day, and members of the general public, as well as informants, provided information that there was going to be a shooting at the courthouse. The Sheriff implemented additional security measures and decided to limit access to the courtroom to "the direct family of both parties." The measures were not implemented by the trial court.

¶79. On the second day of trial, the defendants moved for a mistrial, asserting that the media coverage surrounding the trial-required security measures, and the fact that jurors had

29

to identify themselves upon entering the building, might have tainted the jury. The defendants also amended that motion to add a request for a transfer of venue. At the hearing on these motions, Sheriff Ricky Banks testified about the circumstances described above. At no time did any defendant assert that his right to a public trial had been violated by the Sheriff limiting access to the courtroom to "the direct family of both parties."

¶80. On appeal, however, Jones asserts that these actions violated his Sixth Amendment right to a public trial. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."). Jones cites *Waller v Georgia*, 467 U.S. 39 (1984), and *Pierce v. State*, 250 So. 3d 493 (Miss. Ct. App. 2018), in support of his argument that the trial court erred by failing to consider certain prerequisites under *Waller*, such as reasonable alternatives, before placing a limitation on courtroom access. *Waller*, 467 U.S. at 48; *Pierce*, 250 So. 3d at 496 (¶8). In both cases, however, the defendants had preserved their public-trial objection at trial. *See Waller*, 467 U.S. at 42; *Pierce*, 250 So. 3d at 495 (¶4). In contrast, Jones failed to assert a Sixth Amendment public-trial violation at trial. We find, therefore, that he has waived this issue. *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006); *see also United States v. Reagan*, 725 F.3d 471, 488-89 (5th Cir. 2013).

¶81. In *Hitt*, 473 F.3d at 155, defendants made the same argument as Jones makes here, contending that because the district court failed to satisfy *Waller*'s prerequisites to courtroom closure, this affected their fundamental rights to a public trial, and thus their convictions should be reversed. The Fifth Circuit disagreed, finding that the defendants' argument "overlooks the fact that, regardless of whether the *Waller* prerequisites are met, defendants

30

can waive their right to a public trial. That is what happened here. Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial." *Id.* Similarly, the defendants in *Reagan* asserted that the Supreme Court's decision in *Presley v. Georgia*, 558 U.S. 209, 213 (2010), in which it held that a criminal defendant has a Sixth Amendment right to an open courtroom during voir dire, supported their argument that the district court in that case had violated their public trial rights in closing the courtroom during voir dire and during a motion to suppress. *Reagan*, 725 F.3d at 488. The Fifth Circuit rejected this argument on the basis of waiver, just as it did in *Hitt*, concluding that nothing in *Presley* "excuses the appellants' waiver of this issue." *Id.* at 489.

¶82. Additionally, Jones does not argue that plain error requires reversal on appeal, and we find no basis for reversal under that standard. "The defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal." *Foster v. State*, 639 So. 2d 1263, 1289 (Miss. 1994). As this Court has recognized, "while this exception exists, it is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Stokes v. State*, 141 So. 3d 421, 428 (¶26) (Miss. Ct. App. 2013) (quoting *United States v Frady*, 456 U.S. 152, 163 n.14 (1982)); *see Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989).

¶83. Under long-established precedent, "[t]he purpose of the requirement of a public trial [under the Sixth Amendment] was to guarantee that the accused would be fairly dealt with and not unjustly condemned. History had proven that secret tribunals were effective instruments of oppression." *Estes v. Texas*, 381 U.S. 532, 538-39 (1965). In this case,

31

although courtroom access was limited due to safety concerns, family members of all parties were allowed throughout the proceedings. Defendants were not tried in secret, and Jones has simply shown no basis for determining that "a manifest miscarriage of justice" occurred due to this limitation. We find Jones's public-trial assignment of error without merit.

### IV. Admission of Pistol from Buchanan's Post-Shooting Arrest and Related Testimony

¶84. Buchanan and Jones assert that the trial court erred when it admitted testimony at trial regarding a .40-caliber pistol recovered during Buchanan's post-shooting arrest that happened when he was out on bond. For the reasons addressed below, we find the trial court did not abuse its discretion in allowing the pistol and related testimony into evidence.

¶85. As addressed above, a .40-caliber shell casing was recovered from the scene of the shooting, and a .40-caliber bullet was recovered from Perez Love's head. Two .40-caliber pistols were also recovered from the red Pontiac in which the Loves were traveling. The State's firearms expert, Starks Hathcock, testified at trial that he was able to confirm that the .40-caliber bullet recovered from Perez Love's head did not come from either of these two pistols.

¶86. There was also testimony at trial regarding a .40-caliber pistol that was recovered after the Love shooting, but when Buchanan was out on bond, when Buchanan and Denarius Jackson were stopped by Carroll County deputies six months after the shooting. Buchanan was a passenger in the vehicle that was stopped. Testimony from Investigator Staten, as well as one of the Carroll County deputies at the stop, Rashaun Daniels, established that in the course of the arrest, the Carroll County deputies recovered a .40-caliber pistol from the

32

console between the driver's seat and the front-passenger seat of the vehicle. The pistol was admitted into evidence over a relevancy objection made by Buchanan's lawyer. Testimony from Deputy Daniels also established that the owner of the gun was the driver of the vehicle, Jackson, and that Buchanan was not arraigned on a gun charge.

¶87. Later at trial, Starks Hathcock testified that due to "insufficient reproducible characteristics," the .40-caliber bullet recovered from Perez Love's head could not be "positively included or excluded as having been fired from [the] gun [recovered by the Carroll County deputies during Jackson and Buchanan's post-shooting stop]."

¶88. Buchanan asserts three grounds in support of his argument that this evidence should not have been admitted: (A) it was irrelevant and unduly prejudicial;[17] (B) the testimony surrounding this evidence contained hearsay; and (C) admission of this testimony violated Mississippi Rule of Evidence 404(b). We address each assertion in turn under an abuse of discretion standard. *Anderson v. State*, 154 So. 3d 42, 53 (¶34) (Miss. Ct. App. 2014) (Recognizing that a trial court's decision regarding the relevancy and admissibility of evidence should only be reversed based on an abuse of discretion.)

### A. Inadmissibility under Rule 401 and Rule 402 (Relevancy) and Exclusion under Rule 403 as Unduly Prejudicial

¶89. Under Mississippi Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action

---

[17] As part of Issue 4 in his brief, Jones asserts that the evidence and testimony should not have been admitted because it is irrelevant, and its admission was unduly prejudicial under Mississippi Rule of Evidence 403. Jones makes essentially the same arguments as Buchanan does on these issues.

more probable or less probable than it would be without the evidence." M.R.E. 401. Under Rule 402 of the Mississippi Rules of Evidence, "irrelevant evidence is not admissible." "The definition [of relevancy] is a broad one, favoring admissibility. If the evidence has any probative value at all, the rule favors its admission." *Foster v. State*, 508 So. 2d 1111, 1117 (Miss. 1987), *overruled on other grounds by Powell v. State*, 806 So. 2d 1069 (Miss. 2001).

¶90. When a gun cannot be excluded as having been involved in a shooting, then evidence relating to a weapon recovered from a person suspected of being involved in that shooting is relevant. *See*, *e.g., Brown v. State*, 682 So. 2d 340, 350 (Miss. 1996) (citing *Foster*, 508 So. 2d at 1118)), *disagreed with on other grounds in Portis v. State*, 245 So. 3d 457, 470 n.10 (¶30) (Miss. 2018); *Jackson v. State*, 969 So. 2d 124, 131 (¶36) (Miss. Ct. App. 2007) (finding that evidence that the defendant possessed a gun "similar" to the one described by the victims of an armed carjacking was relevant evidence). Buchanan asserts that the gun and related testimony should not have been admitted because it was Jackson's gun, and there was no proof that Buchanan "constructively possessed" the gun when it was recovered. Buchanan further asserts that there was no connection between the gun and the Love shooting because he was not identified as one of the shooters and also because the gun was found six months after the shooting in another county, thus concluding it was also too remote in time and proximity. Jones likewise asserts that this testimony was not relevant, describing it as testimony relating to "the alleged possession of an unrelated firearm, in an unrelated county, at an unrelated time."

¶91. We find no merit in these arguments in light of the broad discretion afforded the trial

court in determining the admissibility of evidence. Under Rule 401's lenient relevancy test, the State was certainly not obligated to prove Buchanan constructively possessed the gun, nor do we find that the fact that Buchanan was not identified as one of the shooters makes the evidence irrelevant. The State showed that Buchanan had access to the .40-caliber pistol; Buchanan was accused of being a willing participant and an accomplice in the Love shooting where .40-caliber shell casings were found at the scene; a .40-caliber bullet was recovered from one victim's head; and the gun that Holland used during the shooting, identified by two surviving victims as a pistol, was never recovered. The fact that Buchanan had access to one of the guns that might have been used in the shooting, when he was already linked to the crime, is additional evidence that he was involved.[18] Accordingly, we conclude that the trial court did not abuse its discretion in admitting this evidence.

¶92. We also find no merit in Buchanan and Jones's assertion that the trial court abused its discretion when it did not exclude this evidence under Rule 403.[19] No Rule 403 objection to this evidence was made at trial; thus, it was waived. *Stevens v. State*, 458 So. 2d 726, 730

---

[18] We also find no merit in Buchanan's timing and proximity assertions. We do not find that timing is a concern given that neither Holland nor Jones's weapons were recovered in this case, and that Buchanan had been in jail for at least a portion of the time following the shooting and before his arrest in Carroll County. As to proximity, the gun was found in a vehicle, not a fixed location, and thus we have no "proximity" concerns.

[19] Mississippi Rule of Evidence 403 provides as follows:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

M.R.E. 403.

(Miss. 1984) ("The general rule is that a failure to object with specificity in the trial court . . . results in a waiver of review by this Court."). Further, neither Buchanan nor Jones assert plain error, nor do we find any support for reversal on that basis. *Foster*, 639 So. 2d at 1289 (failure to object at trial requires that appellant rely on plain error to raise issue on appeal). We observe that the defense established in cross examination that Buchanan was not the owner of the gun and that he was not charged with its possession. As such, we find no error in the trial court allowing the jury to consider all the evidence, as it is the jury that "determines the weight and credibility to give witness testimony and other evidence." *Gillett v. State*, 56 So. 3d 469, 505 (¶102) (Miss. 2010).

¶93. Further, the fact that the State's firearms expert could not positively include or exclude the bullet found in Perez Love's head as having been fired from the subject pistol does not render the testimony and evidence about this weapon inadmissible under Rule 403. *See Flowers v. State*, 240 So. 3d 1082, 1108-09 (¶¶52-55) (Miss. 2017) (finding that expert testimony that the evidence "did not unequivocally prove that [defendant] had fired a gun" was admissible under Rule 403 because the expert "clearly explained" the basis for his opinion), *cert. granted in part*, 139 S. Ct. 451 (2018), *and rev'd and remanded on other grounds*, 139 S. Ct. 2228 (2019). Hathcock's testimony was clear, and he explained why he could not reach a definitive conclusion with respect to the subject pistol in this case.

¶94. In sum, we find no abuse of discretion in the trial court overruling defense counsel's relevancy objection; nor do we find plain error in any failure to exclude this evidence under Rule 403. *Gray*, 549 So. 2d at 1321.

### B. Hearsay

¶95. Buchanan also asserts that the following testimony from Bill Staten, relating to the course of his investigation and how his investigation led to the recovery of the weapon, contained inadmissible "hearsay within hearsay," as follows:

[BY STATEN]: It is, sir, a semiautomatic .40 caliber Glock pistol model 23.

[BY COUNSEL]: And do you have knowledge of where that .40 caliber Glock came from?

[BY STATEN]: Yes, sir.

[BY COUNSEL]: And where did you obtain this .40 caliber pistol, and not specific details, but from whom and about when, whose possession and about when?

[BY STATEN]: I obtained this from Chief Adam Eubanks of the Carroll County Sheriff's Department on February the 23rd of 2016.

[BY COUNSEL]: All right. But where did it come from, I mean, whose possession was it taken from? If you don't know you don't know.

[BY STATEN] I know.

[BY DEFENSE COUNSEL]: Objection, your Honor, relevance.

BY THE COURT: It's overruled.

[BY STATEN]: It was found in the possession of Sedrick Buchanan when he was arrested.

[BY COUNSEL]: That was when he was a suspect and after he was a suspect in this shooting?

[BY STATEN]: Yes, sir.

¶96. Although defense counsel objected to this testimony, she did not raise a hearsay objection. Any hearsay objection therefore was waived. *Stevens*, 458 So. 2d at 730; *Birkley v. State*, 203 So. 3d 689, 696 (¶15) (Miss. Ct. App. 2016) (explaining that "the failure to object to testimony at trial waives any assignment of error on appeal" (internal quotation marks omitted)). Even if counsel had raised a hearsay objection, the testimony was admissible because it does not contain hearsay. This is so because Investigator Staten testified about what he learned through the course of his investigation. "Statements do not constitute hearsay when admitted to explain an officer's course of investigation or motivation for the next investigatory step by that officer." *Smith v. State*, 258 So. 3d 292, 309 (¶52) (Miss. Ct. App. 2018) (quoting *Fullilove v. State*, 101 So. 3d 669, 675 (¶20) (Miss. Ct. App. 2012)). Accordingly, we find no merit in Buchanan's reliance on an unasserted hearsay objection.

### C. Admission of Testimony Regarding Buchanan's Subsequent Arrest and his Possession of the Weapon

¶97. For the first time on appeal, Buchanan asserts that testimony that the gun was recovered "when he was arrested" impermissibly injected "other bad acts" at trial, in violation of Rule 404(b) and Rule 403. These arguments were never presented to the trial court and are, therefore, waived. *Rubenstein v. State*, 941 So. 2d 735, 761 (¶90) (Miss. 2006) ("An established principle of appellate review is that issues not brought before the trial court are deemed waived and may not be raised for the first time on appeal."). Buchanan does not assert that allowing the jury to hear this testimony amounted to plain error, nor do we find that a vague reference to an undefined "arrest" amounted to a "manifest miscarriage of

38

justice" with respect to Buchanan in this case. *Gray*, 549 So. 2d at 1321. This issue is without merit.

### V. Admission of Keys's Statements Regarding Jones's Pre-Shooting Gun Possession

¶98. Jones asserts that the trial court committed reversible error by admitting Keys's video statement without removing the information that Keys provided about Jones's pre-shooting gun possession.[20] Jones asserts that these portions of the video constitute hearsay and were evidence of "prior bad acts" in violation of Rule 404(b).

¶99. With respect to Jones's hearsay assertion, we have already addressed above that Keys's statement was properly admitted against Jones as an exception to the hearsay rule under Rule 804(b)(6) and that its admission did not violate Jones's rights under the Confrontation Clause. We find no merit in this issue.

¶100. Regarding Jones's Rule 404(b) assertion, the record reflects that Jones made no objection at trial on Rule 404(b) grounds.[21] That objection is therefore waived due to lack of specificity. *Stevens*, 458 So. 2d at 730. Jones does not assert plain error, nor do we find any grounds for finding the trial court in error on that basis. Under Rule 404(b) evidence of other acts is not admissible to prove the character of a defendant, or that he acted in

---

[20] In his brief, Jones describes this information as Keys's responses to Investigator Staten's questions about Keys's "knowledge of Armand Jones's guns," including questions about whether Jones owned any weapons, and where Jones got them.

[21] Before Keys's videotaped statement was played, Jones's counsel asked the trial court "to submit to the jury the tape, only those portions that incriminated Mr. Holland and not Mr. Jones. I'm asking that the tape be redacted for that purpose and to only incriminate the individual they claimed creating an absence of the witness." Defense counsel made no Rule 404(b) objection with respect to Keys's statement.

conformity therewith. M.R.E. 404(b). The Rule also provides, however, that the evidence may be admissible if it is used for other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*.

¶101. In this case, we find that the fact that weapons were accessible to Jones, including an AK-47, was admissible to prove Jones's identity and opportunity. These are acceptable purposes. *See Davis v. State*, 660 So. 2d 1228, 1252 (Miss. 1995). We find that the trial court's decision to allow Keys's statement to be played without removing information about Jones's pre-shooting gun possession and access to guns was not an abuse of discretion and certainly did not amount to a "manifest miscarriage of justice" with respect to Jones in this case. *Gray*, 549 So. 2d at 1321.

## VI. The Sufficiency or Weight of the Evidence with Respect to Buchanan

¶102. Buchanan asserts that his convictions and sentences for aggravated assault should be reversed and rendered because the State failed to present sufficient proof to support the three convictions against him. Alternatively, Buchanan asserts that the jury's verdict was against the overwhelming weight of the evidence and should be reversed. For the reasons addressed below, we find no merit in either assertion and affirm Buchanan's convictions and sentences in this case.

### A. The Sufficiency of the Evidence

¶103. "In reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v.*

40

*State*, 275 So. 3d 100, 109 (¶28) (Miss. Ct. App. 2019). In this regard, this Court "may only reverse a denial of a JNOV motion when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id.*

¶104. The jurors were instructed in this case that they could convict Buchanan of aggravated assault if they found that he willfully, unlawfully, and knowingly and feloniously, acting alone or in concert, attempted to cause or purposely or knowingly caused bodily injury with a deadly weapon. *See* Miss. Code Ann. § 97-3-7 (Rev. 2014). Buchanan argues that the evidence presented by the State did no more than show he was present on the night of the shooting, and thus it was unreasonable for the jury to find him guilty of aggravated assault. We disagree.

¶105. The record reflects that the State showed that on the night of the shooting, Buchanan was at Holland's house with Holland, Jones, Keys, and McClung, and that the Loves had recently "gotten" one of their friends. According to Keys's statement, Jones had stated a few days earlier that he needed to get one of the Loves because of this incident. The group left Holland's house in Keys's Tahoe to go to a club. Keys said in his statement that Jones was armed, but that he (Keys) did not know it at the time. However, Keys also said in his statement that it was not unusual for Jones to have his gun because Jones "always" carried his short AK-47. At trial, two of the surviving victims testified that Holland was also armed that evening.

¶106. The proof established at trial that as the group was traveling on Highway 82, they

41

encountered the Loves. In his statement Keys said that Jones spotted the Loves in the red Pontiac, and Jones called out that it looked like the Loves in that car. According to Keys, Jones then opened fire on the Love vehicle as they passed by. Testimony from two of the surviving victims at trial also elaborated on the circumstances surrounding the shooting. Stigler and Perez Love both testified that the Tahoe pulled up beside them (the Loves in the red Pontiac) and that both Jones and Holland began shooting. Stigler also testified that "[t]hey bumped us into the ditch. . . . They hit the back end of our car . . . so once they bumped the car we couldn't do nothing but go over in the field and roll."

¶107. Both Perez Love and Stigler testified that Holland had a pistol—and the State established that .40-caliber shell casings were found in the vicinity of the scene and a .40-caliber bullet was recovered from Perez Love's head. The pistol that Holland used during the shooting was never recovered.

¶108. As addressed above, it was also brought out at trial that six months after the shooting Buchanan and Denarius Jackson were stopped by Carroll County deputies and a .40-caliber pistol was recovered from the vehicle in which Buchanan was a passenger. The defense established on cross-examination that Buchanan was not the owner of the pistol, nor was he charged with its possession in connection with the stop. Nevertheless, the State established that Buchanan had access to a pistol that the State's firearms expert could not exclude as a weapon used in the Love shooting.

¶109. The evidence at trial also showed that after the shooting, Buchanan made no attempt to leave the group. Holland made arrangements to swap the Tahoe out for another vehicle,

42

he told the group that he had done so, and the group traveled to Moorhead, Mississippi where they swapped vehicles. The group then took backroads to a Best Western hotel in Greenwood and Keys, Buchanan, Jones, and McClung spent the night together in a room rented by McClung. Holland and Jones left for a few hours, and Jones returned without his AK-47. Buchanan turned himself in to law enforcement on September 18, 2015.

¶110. Under Mississippi law, "a person who acts in 'confederation' with others to violate a law is liable as a principal under either the theory of conspiracy or the theory of aiding and abetting." *Adams v. State*, 726 So. 2d 1275, 1279 (¶10) (Miss. Ct. App. 1998) (quoting *Shedd v. State*, 228 Miss. 381, 87 So. 2d 898, 899 (1956)). As such, Buchanan need not be identified as a shooter to be found liable. It is for the jury to determine the weight and the credibility of the evidence. *Pruitt v. State*, 122 So. 3d 806, 809 (¶8) (Miss. Ct. App. 2013). In this case, the jury reviewed the evidence presented at trial in its entirety and determined which facts were to be accepted as true or rejected as false. "This Court may not pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief." *Id.*; *Smith*, 275 So. 3d at 110 (¶34). Viewing the evidence in the light most favorable to the prosecution, as we must, we find that reasonable jurors could have found beyond a reasonable doubt that Buchanan was guilty of aggravated assault. We therefore find that the trial court did not err in denying Buchanan's JNOV motion.

### B.    The Weight of the Evidence

¶111. In reviewing the same evidence and testimony addressed above, we also reject

Buchanan's alternative argument that the trial court erred when it denied his motion for a new trial because the verdict was against the overwhelming weight of the evidence. "Appellate courts review a trial court's decision to deny a motion for a new trial utilizing an abuse-of-discretion standard of review." *Smith*, 275 So. 3d at 110 (¶35). In this regard, "[w]hen considering a challenge to the weight of the evidence, the verdict will only be disturbed when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (quoting *Pruitt*, 122 So. 3d at 809 (¶6)). Relevant to this analysis is the principle that it is the jury's role to assess the weight and credibility of the evidence. *Pruitt*, 122 So. 3d at 809 (¶8). Taking the evidence that supports the jury's verdict as true as outlined above and reviewing it in the light most favorable to the verdict, we find that allowing the verdict to stand with respect to Buchanan would not sanction an "unconscionable injustice." *Id.* at 809 (¶¶6-8).

## VII. Jones's Cumulative-Errors Assignment of Error

¶112. Jones asserts that the cumulative effect of certain other issues and "improprieties" that occurred at trial are grounds for reversal of his convictions and sentences. In particular, Jones asserts that, in combination, the prejudicial effect of the following are grounds for reversal: (A) communication with witnesses while they were under oath and were on the stand; (B) allowing the State's expert, Amber Conn, to testify outside the scope of her expert reports; and (C) comments made by the prosecutor in his closing argument. For the reasons addressed below, we find no merit in this assignment of error.

### A. Communications with Witnesses on the Stand

¶113. Jones asserts there were two occurrences at trial where the "shadow of witness tampering [was cast] over the proceedings." In support of this assertion, Jones cites Mississippi Code Annotated section 97-9-115 (Rev. 2014), which provides:

(1) A person commits the crime of tampering with a witness if he intentionally or knowingly attempts to induce a witness or a person he believes will be called as a witness in any official proceeding to:

(a) Testify falsely or unlawfully withhold testimony; or

(b) Absent himself from any official proceeding to which he has been legally summoned.

¶114. In general, we review the way in which the trial court conducts the trial for abuse of discretion. *Mixon v. State*, 794 So. 2d 1007, 1014 (¶24) (Miss. 2001). As the supreme court recognized in *Mixon*, "the trial judge is the person best situated to decide upon the course of conduct necessary to elicit the truth and yet safeguard the rights of the accused, and unless we can say, from the whole record, he abused his discretion, we should not reverse." *Id.*

¶115. The first incident Jones asserts was improper was when the prosecutor approached witness Cage when she was testifying out of the presence of the jury. The second incident occurred when Sheriff Ricky Banks spoke to witness Jertavious Williams when he was testifying.

¶116. With respect to Jones's first alleged impropriety, the following exchange occurred out of the presence of the jury:

BY THE COURT: All right. Well, let's have the jury in. Apparently, the woman has difficulty testifying. I have no idea why.

BY [COUNSEL FOR JONES]: I don't either, your Honor.

45

BY THE COURT: I don't know if she's scared, I don't know if she's nervous, I don't know if she is lying and she's scared about lying, I have no idea, but I'm gonna try to let her get a little relaxed which is the point of this exercise, but we're ready for the jury now. Ma'am, you're gonna have to speak loudly and you're gonna have to sit up straight. You're gonna have to look at the courtroom. You can't look down at whatever you've got in your hand.

BY [THE STATE]: May I approach her, Judge? I think she was –

BY [COUNSEL FOR HOLLAND]: Your Honor, I would like to hear whatever he's saying to her. Could you stop until I get there? I would like to hear. What did you say to her? You can't talk to a witness in the middle of their testimony. Your Honor, I would like to state for the record that [the prosecutor] talked to the witness about her testimony during her testimony.

¶117. The second incident occurred later in the trial when Williams was testifying:

BY [COUNSEL FOR HOLLAND]: Your Honor, I'm sure it's unintentional, but the sheriff is talking to the witness on the stand.

BY THE COURT: I beg your pardon?

BY [COUNSEL FOR HOLLAND]: I said, I would imagine it's unintentional, but the sheriff is conversating [sic] with the witness as he's testifying. He should not be conversation with the witness while he's testifying.

BY THE COURT: I haven't observed that.

BY THE SHERIFF: I thought he said he would kill Bill, and I asked him if he said he would kill Bill and he said no.

BY THE COURT: You may proceed.

¶118. As we note above, the trial judge is the person in the best position to decide the way

46

in which the trial should be conducted. *Mixon*, 794 So. 2d at 1014 (¶24). We find no abuse discretion in the trial court allowing the witnesses to continue testifying under these circumstances. Indeed, Jones cites no authority for the proposition that these instances constitute witness tampering as defined under section 97-9-115, nor does he cite any authority for his assertion that "it is explicitly known that it is improper for a sworn witness on the stand to be spoken to during the course of their testimony." *See* M.R.A.P. 28(a)(7) ("The argument [section of Appellant's Brief] shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on."). We find no error with respect to these incidents.

### B. Expert's Testimony Purportedly Outside the Scope of Her Reports

¶119. Jones asserts that Amber Conn was allowed to testify outside the scope of her expert reports. We apply an abuse of discretion standard "[w]hen reviewing evidentiary rulings made by the trial court." *Brown v. State*, 965 So. 2d 1023, 1026 (¶10) (Miss. 2007).

¶120. The record reflects that Conn was accepted as an expert in crime scene investigation. She testified that she examined the Pontiac Grand Prix that the victims had been traveling in, and that she observed that their vehicle sustained multiple projectile defects. She explained that she used trajectory rods to determine the angle at which the bullets were fired. Based on the angle of the bullets, Conn opined that the shooting began at the back of the vehicle, and that the shots were fired from back to front. No objection was raised regarding this testimony.

47

¶121. Conn also began to offer her opinion that, based on the fact that the trajectory of the bullet holes was mostly in downward angles, it was likely that the shooter was in a taller vehicle. Before she finished her sentence, however, defense counsel objected, and there was a bench conference, as reflected in the following transcript excerpt:

| [BY THE STATE]: | Okay. And from your determination of the trajectories that you've testified about, the moving vehicle, do you have an opinion as to the size and height from which the bullet came? |
|---|---|
| [BY CONN]: | The trajectories were mostly downward angles. So that tells me that the vehicle that the shooter was in was most likely a larger-- |
| BY [COUNSEL FOR JONES]: | Objection, your Honor. May we approach briefly? |
| BY [COUNSEL FOR JONES]: | Your Honor, I've been given the expert's report. It makes reference to angles but not reference to any vehicle angles or anything like that. This is outside the scope of the expert report that we've been given. I don't have a problem with the angles, but as far as seeing the vehicle and things of that nature, I think she's got to be limited to the report that has been provided in discovery and not going outside of that. . . . |
| BY [COUNSEL FOR JONES]: | I'm complaining about the fact she's talking about a vehicle passing, that this other shot came from the vehicle. I don't have a problem with the angles and trajectory, but for her to make those assumptions outside the report. It's not in the report, the angles and trajectories, the shooter was moving. I think it's outside the scope of her report, that's my objection. |
| BY THE COURT: | Your objection is overruled. |

¶122. Conn continued her testimony on direct examination, but the record reflects that she did not offer an opinion regarding the size of the vehicle that the shooters traveled in or the angle from which they shot.

¶123. In addressing Jones's contention that Conn was allowed to testify outside her reports, we first observe that as an appellate court, we "cannot consider that which is not in the record." *Hampton v. State*, 148 So. 3d 992, 995 (¶7) (Miss. 2014). The record in this case contains only Conn's "Report of Crime Scene Findings" (Trial Exhibit D-3). This report provides that "[r]esults of evidence examinations and reports thereof will be the subject of separate reports available through the Mississippi Crime Laboratory." These "separate reports" are not in the appellate record. We therefore decline to consider Jones's assertions due to the lack of a complete record on this issue. *Hampton*, 148 So. 3d at 995 (¶7).

¶124. We further observe that Jones's assertion on appeal appears to be, at least in part, that the trial court erred in permitting Conn to testify about the size of the shooters' vehicle. As the transcript passage quoted above reflects, however, Conn did not testify about the size of the shooters' vehicle. Defense counsel cut her off before she did so. For this additional reason, we reject Jones's assertion on this point.

### C. Prosecutor's Comments During Closing Argument

¶125. Jones also asserts that the prosecutor inappropriately referred to the defendants as "bad guys" and referred to their conduct as "vicious and dangerous" during his summation. Jones acknowledges that defense counsel did not object to these statements at trial, but he asserts that the comments were so inflammatory that the trial court should have objected on

its own motion. Jones relies upon *White v. State*, 228 So. 3d 893 (Miss. Ct. App. 2017), for this proposition, a case in which this Court, applying plain error review, found reversible error based upon the cumulative effect of the prosecutor's "litany of prejudicial comments during closing." *Id.* at 907-08 (¶¶40-41). These included comments on evidence excluded by the Court; comments on defendant's future danger to society; improper comments on the credibility of witnesses and the veracity of their testimony; and improper comments vilifying the defendant. *Id.* at 908-11 (¶¶41-56). The Court found that "the cumulative effect of these comments combined with the copious amount of other instances of misconduct creates reversible error." *Id.* at 911 (¶56). Under these circumstances, the Court found that reversal based upon plain error was warranted because "the State's comments resulted in a manifest miscarriage of justice and a violation of White's constitutional rights of due process and fair trial by an impartial jury." *Id.* at 908 (¶41).

¶126. We find no such circumstances in this case. Reviewing the State's closing argument in context, although the prosecutor referred to the defendants as "bad guys," it also admitted that nobody "is a choirboy in this case." Further, the two references made by the prosecutor in this case are nowhere near as prejudicial as the "litany" of comments made by the prosecutor in White, who made "glaring arguments" about the defendant's propensity to repeat his offenses, and repeatedly made remarks vilifying the defendant. *Id.* at 909-11 (¶¶46-56).

¶127. We find that reversal based upon plain error is not warranted based upon the prosecutor's comments in this case. The supreme court's determinations in *Hobson v. State*,

730 So. 2d 20 (Miss. 1998), and *Edwards v. State*, 737 So. 2d 275 (Miss. 1999), support our determination in this case. In *Hobson*, the supreme court recognized that "[s]o long as counsel in his address to the jury keeps fairly within the evidence and the issues involved, wide latitude of discussion is allowed." *Hobson*, 730 So. 2d at 27 (¶25). With this rule in mind, the court held that the State's reference to the defendant as "cold-blooded, evil, and unfeeling" was not so overly inflammatory or outside the evidence presented that reversal was required. *Id.* Similarly, in *Edwards*, the supreme court found that the prosecutor's use of the word "evil" to describe the defendant in opening statements did not warrant reversal. *Edwards*, 737 So. 2d at 298 (¶48).

¶128. We likewise find that given the facts presented at trial, the State's reference to the defendants as "bad guys" and their behavior as "vicious and dangerous" does not constitute reversible error under a plain error standard of review. In short, we find nothing in the State's comments in closing that "resulted in a manifest miscarriage of justice and a violation of [Jones's] constitutional rights of due process and fair trial by an impartial jury." *White*, 228 So. 3d at 908 (¶41). We accordingly find no basis for reversal.

¶129. In sum, we find that none of Jones's assertions of purported "improprieties" at trial warrant reversal. As the Mississippi Supreme Court has recognized, "where there was no reversible error in any part, so there is no reversible error to the whole." *Manning v. State*, 735 So. 2d 323, 352 (¶74) (Miss. 1999). We therefore reject Jones's "cumulative error" argument in toto.

¶130. **AFFIRMED.**

51

**BARNES, C.J., GREENLEE, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. J. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**McCARTY, J., CONCURRING IN PART AND IN RESULT:**

¶131. Because I believe that the multiple tests implemented today regarding forfeiture by wrongdoing are unnecessarily complex, I respectfully concur in part and in result. We should strive to provide clarity to the Bench and Bar in how to implement the Mississippi Rules of Evidence. This is especially so because "[t]rials are often chaotic and sometimes intensely adversarial," and we need the Rules "to bring order and fair play to the trial process." *Richards v. State*, No. 2017-KA-00809-COA, 2019 WL 1771923, at *4 (¶18) (Miss. Ct. App. Apr. 23, 2019). We need tests and rules that can be applied in the chaotic arena of trial. Because I have concerns that the approach we take today cannot easily be applied, I write separately for the same reasons I dissented in part in *McClung v. State,* No. 2017-KA-01053-COA (Miss. Ct. App. Dec. 3, 2019).

**WESTBROOKS, J., JOINS THIS OPINION.**

**J. WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶132. I concur that Jones's convictions should be affirmed. However, I would reverse and render a judgment of acquittal on the three remaining counts against Buchanan because the evidence presented was insufficient to convict him of aggravated assault.

¶133. When we address a challenge to the sufficiency of the evidence, all credible evidence

of guilt must be taken as true, and the State is entitled to all reasonable inferences that may be drawn therefrom. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018). We consider the evidence in the light most favorable to the State, although we also keep in mind that the State must prove the defendant's guilt beyond a reasonable doubt. *Id.* This burden must be satisfied with evidence, not speculation or conjecture. *Edwards v. State*, 469 So. 2d 68, 69-70 (Miss. 1985); *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974). We will reverse and render if the facts and inferences point in favor of the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt. *Haynes*, 250 So. 3d at 1244 (¶6). But we will affirm the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Shelton v. State*, 214 So. 3d 205, 256 (¶29) (Miss. 2017)).

¶134. There is no evidence that Buchanan fired a gun into the red Pontiac, but the State argues that he aided and abetted Jones and Holland. "One who aids and abets another in the commission of a crime is guilty as a principal." *Hughes v. State*, 983 So. 2d 270, 276 (¶14) (Miss. 2008). "To aid and abet the commission of a felony, one must do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime or participate in the design of the felony." *Id.* (quotation marks, ellipsis, and brackets omitted). We do "not recognize guilt by association." *Id.* "Mere presence, even with the intent of assisting in the crime, is insufficient unless the intention to assist was in some way communicated to the principal." *Id.* (quotation marks and brackets omitted). Likewise, mere presence "at the commission of a crime without taking any steps to prevent it does not alone

indicate such participation or combination in the wrong done as to show criminal liability."

*Id.* This is true even if the defendant approves of the criminal act. *Id.*

¶135. None of the eyewitnesses identified Buchanan as a passenger in the Tahoe. The only evidence against him was Keys's statement.[22] However, during his approximately forty-three-minute recorded statement, Keys said little about Buchanan and nothing to implicate him as an aider and abettor in the shooting. Keys stated only that Buchanan was sitting in the third- row seat of the Tahoe when the shooting occurred. Keys stated that there was no discussion about shooting or seeking revenge against the Loves before the group left Holland's house that night en route to a lingerie party. Keys denied that he knew about any plan to find the Loves or knew the Loves would be on the highway in the Pontiac. Keys claimed that he was shocked when Jones raised his gun and began shooting at the Pontiac. According to Keys, "days prior" to the shooting Jones had said that he needed to get the Loves because they had shot a friend of Keys and Jones. The majority relies on this prior conversation as evidence against Buchanan. *Ante* at ¶105. But there is *no evidence* that Buchanan was a party to that conversation or knew anything about Jones's or Holland's intentions. Keys stated that immediately after the shooting, Holland made arrangements to switch cars in Moorhead. And after the group arrived at the hotel in Greenwood, Holland and Jones left alone, apparently to get rid of their guns. Keys, McClung, and Buchanan spent

---

[22] The U.S. Supreme Court has held that a reviewing court may consider erroneously admitted evidence when ruling on a challenge to the sufficiency of the evidence. *Lockhart v. Nelson*, 488 U.S. 33, 40 (1988); *accord Hillard v. State*, 950 So. 2d 224, 230 (¶28) (Miss. Ct. App. 2007). Because I would hold that the evidence against Buchanan, including Keys's statement, was legally insufficient to sustain his convictions, I do not address Buchanan's challenge to the admission of Keys's statement.

the night at the hotel and called a friend to pick them up in the morning. At the time of his interview, Keys had not spoken to Buchanan or McClung since the morning after the shooting.

¶136. Even with Keys's statement, *see supra* n.22, the evidence is insufficient to sustain Buchanan's conviction because it establishes only his presence at the scene of the crime. There is nothing in Keys's statement to show that Buchanan participated in or knew about any plan to attack the Loves. Nor is there any evidence that he encouraged or assisted Jones or Holland in the shooting. To find Buchanan guilty as an aider and abettor in the shooting, the jury had to find, beyond a reasonable doubt, that Buchanan actually aided, counseled, or encouraged Jones or Holland in the commission of the crime. *Jones v. State*, 710 So. 2d 870, 874 (¶15) (Miss. 1998). There is no evidence to support such a finding. Keys's statement proves only that Buchanan was present in the Tahoe, which is insufficient to sustain the convictions. *Hughes*, 983 So. at 276 (¶14).

¶137. The majority also argues that Buchanan's convictions are supported by (1) his physical proximity to a .40-caliber pistol six months after the shooting, *ante* at ¶108, and (2) the fact that he "made no attempt to leave the group" after the shooting, *ante* at ¶109. However, neither of these facts supports a reasonable inference that Buchanan aided and abetted the shooting.

¶138. First, the pistol was owned by and registered to Danarius Jackson and was found in the center console of Jackson's car six months after the shooting. The State's ballistics expert could only testify that "due to insufficient reproducible characteristics the [.40 caliber]

cartridge casing [found at the crime scene] could not be positively included or excluded as having been fired from [Jackson's] gun." The only tenuous connection between the gun and anyone or anything in this case is that Buchanan happened to be in Jackson's car when he was arrested on unrelated charges in Carroll County—*six months* after the shooting and *five months* after Buchanan had turned himself in on the charges in this case.[23] Moreover, there is no suggestion that Buchanan was one of the shooters in this case, nor is there any evidence that Buchanan ever possessed the pistol that Holland used. In short, there is no evidence that Jackson's gun was used in the shooting or that Buchanan ever had possession of it. All we know is that six months after the shooting Buchanan was sitting in a car with a man who had a .40-caliber handgun. A jury would have to pile speculation upon conjecture to find that Buchanan provided Jackson's gun to Jones to shoot at the Loves. That is not a conclusion that can be reached beyond a reasonable doubt based on inferences reasonably drawn from the evidence.

¶139. Second, the mere fact that Buchanan "made no attempt to leave the group" after the shooting, *ante* at ¶109, is insufficient to establish, beyond a reasonable doubt, that he encouraged or assisted Jones or Holland prior to or during the shooting. As noted above, mere presence at a crime does not support a conviction for aiding and abetting—even if the defendant took no steps to prevent the crime and actually approved of the crime. *Hughes*, 983 So. 2d at 276 (¶14). It follows that Buchanan cannot be convicted of aiding and abetting just because he did not quickly disassociate himself from Jones and Holland after he

---

[23] Buchanan turned himself in on September 18, 2015, and later bonded out. He was arrested in Carroll County in February 2016.

witnessed them open fire on the Loves. An "attempt to leave" a murderous group can be a risky proposition. It would be speculation and conjecture to say that Buchanan must have somehow encouraged or assisted in the crime just because he "made no attempt to leave" afterward.

¶140. Tellingly, the majority opinion does not even hazard a guess as to what type of assistance or encouragement Buchanan might have provided to Jones or Holland. The majority simply holds that there is sufficient evidence to establish, beyond a reasonable doubt, that Buchanan aided and abetted them in some unknown and unspecified way. Such a conclusion requires far too much speculation to support a criminal conviction. Therefore, as to Buchanan's convictions, I respectfully dissent.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**